

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-22-1995

# Baker v Monroe Township

Precedential or Non-Precedential:

Docket 94-5069

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Baker v Monroe Township" (1995). *1995 Decisions.* Paper 79.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/79

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 94-5069
_____

INEZ BAKER, individually and as Guardian
ad Litem of Tiffany Baker; TIFFANY BAKER;
COREY BAKER; and JACQUINE ANDERSON (suing
in their own right if of majority),

Appellants

v.

MONROE TOWNSHIP; OFFICER ROBERT ARMSTRONG
(individually and officially); JOHN DOES
1-8 (officers of the Monroe Township
Police Department, individually and in
their official capacity); JOHN DOES 9-12
(officers of the U.S.D.E.A., individually
and in their official capacity); JOHN
DOES 13-16 (law enforcement officers
acting individually and in their official
capacity); all jointly and severally liable
in both individual as well as official
capacities,

Appellees

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 92-cv-03203)

_____

Argued: August 12, 1994

Before: BECKER, ALITO, Circuit Judges, and
JOHN R. GIBSON, Senior Circuit Judge[*]

(Filed March 22, 1995)

_____

[*]    The Honorable John R. Gibson, United States
Senior Circuit Judge for the Eighth
Circuit Court of Appeals, sitting
by designation.

JEFFREY A. LIBERT, ESQUIRE (ARGUED)
ANGELO J. FALCIANI, ESQUIRE
29 South Broad Street
Woodbury, NJ  08096

Attorneys for Appellants


SUSANNA J. MORRIS, ESQUIRE (ARGUED)
Budd, Larner, Bross, Rosenbaum,
   Greenberg & Sade
200 Lake Drive East
Woodland Falls Corporate Park
Suite 100
Cherry Hill, NJ  08002

Attorney for Appellees

_____

**OPINION OF THE COURT**
_____


JOHN R. GIBSON, <u>Senior</u> <u>Circuit</u> <u>Judge</u>:


     Inez Baker, her two children, Corey and Tiffany Baker, and her foster daughter, Jacquine Anderson, appeal from a summary judgment against them in their 42 U.S.C. § 1983 (1988) claim against Monroe Township, Robert Armstrong, a Monroe Township police officer, and numerous John Doe defendants who were police officers or federal Drug Enforcement Agency agents.  The Baker family alleges illegal search and seizure of their persons and property and use of excessive force, which occurred as the family group approached the home of Mrs. Baker's son, Clementh Griffin, just as police were commencing a drug raid there.  The district court entered judgment for Monroe Township and for Armstrong,

holding that the Bakers made no showing that either of these defendants was legally responsible for any violation of the Bakers' rights that may have occurred. The district court also refused to allow the Bakers to amend their complaint to correct the names of the John Doe defendants, and refused to reconsider the summary judgment ruling based on an affidavit that was filed out of time under the local rules. We reverse and remand on the issue of whether the Bakers showed evidence that could render Armstrong personally liable for the alleged civil rights violations and also remand for consideration of whether Tiffany Baker should be permitted to amend to correct fictitious names.

Around 8:30 on the evening of Friday, June 1, 1990, Mrs. Baker, Corey, Tiffany, and Jacquine were approaching the home of Clementh Griffin, Mrs. Baker's son, and his girlfriend, Cheryl Woods, who had invited them to dinner. It was still light outside, though dusk. At the same time, police from three jurisdictions were launching a drug raid on the same apartment, authorized by a "no-knock" warrant.[1] As the Bakers walked up to

---

[1] The warrant consisted of a form authorizing search of: "the (x) premises (x) person (x) vehicle described below" (emphasis added). Though x's were filled in each of the three blanks, the space for the promised description contained only an identification of the premises to be searched and mentioned nothing about any persons. Although the dissent, infra at 8-9, considers this a warrant for search of specified persons, the only common-sense interpretation of the document is that no one ever bothered to complete it to include specified persons as well as premises. This flawed document does not demonstrate that the magistrate determined search of any particular person to be justified.

The "description below" referred only to an apartment in a three story wood frame residence. There is no description,

the door, they were suddenly surprised by officers running past them with guns in their hands, shouting, "Get down." Some of the officers (including Armstrong) ran directly into the house, but others forced the Bakers down to the ground. The Bakers testified that the officers pointed guns at them, handcuffed them and left some of them handcuffed for as much as twenty-five minutes, searched Corey Baker, and emptied Mrs. Baker's pocketbook onto the ground outside the apartment. After the Bakers identified themselves as relatives of Clementh Griffin, the police released them.

---

general or specific, of any person as in the warrant we considered in United States v. Ferrone, 438 F.2d 381, 389 (3d Cir.), cert. denied, 402 U.S. 1008 (1971). Nor did the language in the description refer to a place and any or all "persons found therein" as did the warrants before the courts in State v. Sims, 382 A.2d 638, 642 (N.J. 1978), and State v. DeSimone, 288 A.2d 849, 850 (N.J. 1972). The Fourth Amendment requires that the warrant particularly describe the place to be searched and the persons to be seized. The face of the warrant demonstrates its failure to meet the requirement of the Fourth Amendment. The dissent engages in a lengthy interpretation of the warrant to find authorization for a search of persons found on the premises. The dissent then proceeds to analyze Sims and DeSimone, cases which specifically referred to persons on the premises, to include a question of probable cause. This elaborate interpretation and analysis and the length to which the dissent goes in developing it simply point up the inadequacy of the warrant to describe any person generally or specifically. Having said as much, we need not speculate further as to whether the dissent's interpretation would cover not only persons found on the premises, but those outside the premises and on the sidewalk and steps leading into it. It is also evident that the dissent makes its interpretation and bases its analysis on the facts taken in the light most favorable to the party moving for summary judgment rather than the non-movant, contrary to the constraints we have referred to that guide us in reviewing an order granting summary judgment. Infra at 7.

The Bakers brought this action under 42 U.S.C. § 1983, alleging, <u>inter alia</u>, violations of their Fourth Amendment rights by illegal seizure and use of excessive force. They specified only Robert Armstrong and Monroe Township as defendants, using fictitious names for sixteen other defendants whom they identified as assisting in the raid.

Armstrong and Monroe Township moved for summary judgment. The district court held that, assuming the Bakers' Fourth Amendment rights were violated, the Bakers made no showing that Armstrong either committed the violations personally, directed someone else to commit them, or had knowledge of the violations and acquiesced in them. Instead, the court stated, the evidence indicated that Armstrong was inside the apartment while the alleged violations took place outside the apartment. Moreover, there was no evidence that Armstrong should have trained the other officers to behave differently, for though he was in charge of this particular raid, the other men were employees of the federal Drug Enforcement Agency and the Gloucester County Prosecutor's office, whom Armstrong could expect to be adequately trained. Since Armstrong was the only Monroe Township official involved in the raid, the district court found no causal link between anything the Township did or did not do and the harm alleged.

The Bakers then sought leave to amend their complaint to correct the fictitious names of several of the officers they allege participated directly in the rough treatment. The Bakers brought this suit on June 1, 1992, the last day before expiration

of the two-year statute of limitations. Despite having received in March 1993 the names of the officers involved in the raid, the plaintiffs did not move to amend their complaint to correct the fictitious names until after the district court had entered summary judgment against them on November 5, 1993. At that point, the district court ruled that the Bakers had not made the requisite showing of diligence under New Jersey law, see Farrell v. Votator Div. of Chemetron Corp., 299 A.2d 394 (N.J. 1973), and that state law would not permit the relation-back of the Bakers' amended complaint. Their claims would be time-barred, and so the district court denied the Bakers' motion to amend their complaint.

The Bakers moved for reconsideration of the summary judgment against them, arguing that they asserted state law claims that should not have been dismissed and that the court erred in its ruling on the section 1983 claims. About three weeks after their motion for reconsideration, they produced for the first time the affidavit of Clementh Griffin, containing evidence which was relevant to the elements the district court earlier held were not established. The court ruled that the Bakers filed their motion for reconsideration too late under the local rules, General Rules for the District of New Jersey 12I, and therefore denied the motion, except that it remanded the state law claims to the state courts.

On appeal, the Bakers argue that the district court erred in entering summary judgment against them and in denying

their motions for reconsideration and to amend their complaint to correct the fictitious names.

## I.

The district court did not abuse its discretion in holding that the Bakers were not diligent in seeking to correct the fictitious names in their complaint. However, the Bakers argue that Tiffany and Corey Baker were minors at the time of the events in question and that the statute of limitations has not expired as to them.[2] Though the Bakers' brief does not supply us with Corey Baker's birth date, the defendants inform us that Corey Baker reached majority in January 1991, some six months after the events in question, and that the statute of limitations has expired as to him. Once the defendants showed the applicable limitation period had elapsed, Corey Baker had the burden to prove the statute was tolled. Burlington County Country Club v. Midlantic Nat'l Bank South, 538 A.2d 441, 443 (N.J. Sup. Ct. 1987). This he has failed to do. On the other hand, the defendants concede that the statute "may" not have expired for Tiffany Baker, who was born on December 1, 1974. We therefore remand for the district court to determine whether Tiffany Baker should be granted leave under Fed. R. Civ. P. 15 to amend her complaint.

---

[2]The evidence also indicates Jacquine was a minor at the time of the events, but the plaintiffs do not mention this.

## II.

We will not disturb the district court's refusal to consider the Clementh Griffin affidavit. The Bakers argue that the district court miscalculated the number of business days between entry of its judgment and the motion to reconsider. Even if this is true, the motion to reconsider only reiterated arguments already before the court (except for the motion to remand state law claims, which the court granted). The only filing that would actually help the Bakers was the Griffin affidavit, which was in itself essentially a new motion to reconsider and which was filed well out of time. The district court's ruling was warranted under the local rules.

## III.

The merits of this case involve Fourth Amendment questions of what police may lawfully do with persons who happen to find themselves in the middle of a drug raid, and questions of responsibility under section 1983 of supervisors and municipalities for others' conduct.

We review the district court's entry of summary judgment de novo, viewing the evidence in the light most favorable to the nonmovant and giving the nonmovant the benefit of all reasonable inferences. Spain v. Gallegos, 26 F.3d 439, 446 (3d Cir. 1994). When the movant has produced evidence in support of his motion, the nonmovants cannot rest on their pleadings, but must come forward with enough evidence to create a material issue of fact. See id.

In order to render Armstrong personally liable under section 1983, the Bakers must show that he participated in violating their rights, or that he directed others to violate them, or that he, as the person in charge of the raid, had knowledge of and acquiesced in his subordinates' violations.[3] See Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990); Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

A municipality can only be liable under section 1983 when the municipality itself causes the violation. City of Canton v. Harris, 489 U.S. 378, 385 (1989). The Bakers must show that a policymaker for the Township authorized policies that led to the violations or permitted practices that were so permanent and well settled as to establish acquiescence. Simmons v. City of Philadelphia, 947 F.2d 1042, 1064 (3d Cir. 1991), cert. denied, 112 S. Ct. 1671 (1992); Andrews, 895 F.2d at 1480.

We reject the Bakers' argument that Monroe Township is liable for the actions of police from other jurisdictions solely by virtue of a failure to train those police. It is unreasonable to expect Monroe Township to retrain officers from the County prosecutor's office and the D.E.A., and the Bakers have produced

_____

[3]It is also possible to establish section 1983 supervisory liability by showing a supervisor tolerated past or ongoing misbehavior, see e.g. Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 724-25 (3d Cir. 1989), cert. denied, 493 U.S. 1044 (1990); since the facts of this case do not implicate such a theory, we need not belabor it.

no evidence showing that Monroe Township had reason to think such a thing necessary.

The actions the Bakers complain of are best analyzed in four aspects ranging from the least objectionable to the most.

**A.**

First, we consider Armstrong's order to the Bakers to "Get down" as Armstrong ran into the Griffin-Woods apartment. Armstrong freely admits that he shouted this order when he saw the Bakers and that the other officers "followed suit," all shouting the same command. Armstrong also specifically alluded to this as the customary way of doing things: "Just from working over the years, I know that the people I'm passing are going to be secured, again, for their safety as well as our safety." However, as Armstrong described the practice, it does not violate the Fourth Amendment. Armstrong testified that it was necessary to burst into the house without warning in order to prevent people in the house from destroying evidence. He had a "no-knock" warrant for this very reason. The Bakers were at the doorstep as he ran in. He feared the raid could result in violence, and considered it necessary to get the Bakers down on the ground, partly to protect them from stray gunshots. Armstrong also said that at the instant he encountered the Bakers, he did not know whether the Bakers were coming to or going from the house, nor did he know whether they were the very people whose house he had a warrant to search. There is no doubt but that the Bakers had some relationship to the apartment since

Corey was on the steps and the others were right behind. Moreover, Armstrong testified that the presence of citizens standing in the middle of the raid could prevent the police officers from defending themselves, since they would not be able to return fire in the midst of a crowd.

Under these circumstances, it was entirely reasonable to order the Bakers to "get down," until the situation was under control. Armstrong's order is justified under two lines of Supreme Court cases. Under Michigan v. Summers, 452 U.S. 692 (1981), during execution of a search warrant, police can detain the occupant of the house they have a warrant to search. This is reasonable to protect the police, to prevent flight, and generally to avoid dangerous confusion: "The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." Id. at 702-03. The dangerousness of chaos is quite pronounced in a drug raid, where the occupants are likely to be armed, where the police are certainly armed, and the nature of the suspected drug operation would involve a great deal of coming and going by drug customers. In his application for the warrant, Armstrong swore that a concerned citizen advised that "numerous young adults and children" were going to the apartment and he had confirmed this personally by surveillance. Armstrong said he did not know whether or not the Bakers were the occupants of the house. Although Summers itself only pertains to a resident of the house under warrant, it follows that the police may stop people coming to or going from the house if police need to ascertain whether

they live there.  See United States v. Moreno, 891 F.2d 247, 249 (9th Cir. 1989) (citing both Summers and Terry v. Ohio, 392 U.S. 1 (1968)).

The order to "get down" is also permissible under the line of cases following Terry v. Ohio, 392 U.S. 1 (1968), which permit an investigatory stop, not rising to the level of arrest, in situations presenting less than probable cause.  Under the Terry cases, the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect.  See United States v. Sharpe, 470 U.S. 675, 682-83 (1985); see generally United States v. Chaidez, 919 F.2d 1193, 1197-98 (7th Cir.), cert. denied, 501 U.S. 1234 (1991); United States v. Trullo, 809 F.2d 108, 111 (1st Cir.), cert. denied, 482 U.S. 916 (1987).  Here, the need to ascertain the Bakers' identity, the need to protect them from stray gunfire, and the need to clear the area of approach for the police to be able to operate efficiently all made it reasonable to get the Bakers down on the ground for a few crucial minutes.  Armstrong's initial order to "get down" and the other officers' actions in pushing the Bakers down to the ground did not constitute a Fourth Amendment violation, and therefore did not render Armstrong himself or Monroe Township liable.

**B.**

Second, we consider the closer question of whether the police detained the Bakers for an unconstitutionally long time. As with the order to "get down," Armstrong admits that he was aware the Bakers were being detained until they could be identified and that this was consistent with his regular practices. Under Sharpe, 470 U.S. at 685-86, there is no per se rule about the length of time a suspect may be detained before the detention becomes a full-scale arrest. Instead, the court must examine the reasonableness of the detention, particularly whether the police were diligent in accomplishing the purpose of the stop as rapidly as possible. Here, the Bakers state they were held a total of about twenty-five minutes, about ten minutes outside and as long as fifteen minutes inside. Significantly, Armstrong did not "holler" out the door for the others to bring the Bakers inside until after the house had been "secured," meaning that police had located and gained control over the people in the house. Armstrong testified that this took only a "minute or two," but there is obviously a margin for error here; it would be absurd to expect police in peril for their lives to time their motions with a stop-watch. Given the uncertainty over what would happen until the house was secured, it is not surprising that the police could not begin sorting out who was who for the first ten minutes. After they were brought in the apartment, Tiffany Baker, Inez Baker and Armstrong all estimated that fifteen minutes elapsed before the Bakers left. At least part of that time was taken up with Armstrong delivering an apology and explanation to Mrs. Baker for the detention.

(Armstrong said: "It was probably more time explaining what went on in that fifteen minutes of detaining the Baker family than anything else.") Under Sharpe when "police are acting in a swiftly developing situation . . . court[s] should not indulge in unrealistic second-guessing." 470 U.S. at 686. We cannot say that a detention of fifteen minutes time to identify and release a fairly large group of people during a drug raid is unreasonable. Therefore, Armstrong's admission that the Bakers were detained fifteen minutes inside and some amount of time outside, taken alone, does not render him or Monroe Township liable.

## C.

Third, we consider the use of guns and handcuffs. The district court concluded that the Bakers' depositions do not indicate Armstrong personally used guns or handcuffs, nor that he directed anyone else to do so. This conclusion is borne out by the record. Armstrong was the senior officer in charge of executing the warrant. Corey Baker testified that as he stood on the doorstep, Armstrong ran past him, into the house. Then, while the Baker family was still outside, others pointed guns at them, pushed them down to the ground and handcuffed them. Other police brought Clementh Griffin and Cheryl Woods outside, but Tiffany Baker could not say whether Armstrong came outside. After the Bakers had been held outside for a few minutes, police brought them into the house. They left all the family but Corey in the kitchen. Police took Corey into the bedroom and searched

him, but Corey specifically said Armstrong was not involved in the search. Mrs. Baker said that she saw Armstrong for the first time while inside the apartment and that he came into the kitchen and told the other officers to unhandcuff her and remove the gun that was pointed at her. Tiffany Baker said she never saw Armstrong until they were outside, after they had been released and were leaving. No testimony indicates Armstrong participated personally in the hand-cuffing or gun-point detention.

There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest. See, e.g., United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989) (use of handcuffs and gun during investigatory stop); United States v. Trullo, 809 F.2d at 113 (use of gun during investigatory stop); United States v. Eisenberg, 807 F.2d 1446, 1451 (8th Cir. 1986) (same); United States v. Hardnett, 804 F.2d 353, 357 (6th Cir. 1986) (same), cert. denied, 479 U.S. 1097 (1987); see generally United States v. Chaidez, 919 F.2d at 1198. But use of guns and handcuffs must be justified by the circumstances, as in the cases listed. Moreover, we must look at the intrusiveness of all aspects of the incident in the aggregate. In this case, adding up the use of guns and handcuffs and, indeed, the length of the detention, shows a very substantial invasion of the Bakers' personal security. See United States v. Del Vizo, 918 F.2d 821 (9th Cir. 1990) (drawing weapon on cooperative suspect, ordering him to lie prone, and handcuffing amount to arrest). Armstrong himself said that the use of handcuffs would have been inappropriate until there was an arrest, and that the other

officers with him work the same way.  Here, accepting the Bakers' testimony, the police used all of those intrusive methods without any reason to feel threatened by the Bakers, or to fear the Bakers would escape.  It was dusk but still daylight as Mrs. Baker, Corey and Jacquine, both age 17, and Tiffany, age 15, approached the apartment.  Considering the facts in the light most favorable to the Bakers, the appearances were those of a family paying a social visit, and while it may have been a visit to a wayward son, there is simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used.  If Armstrong acquiesced in the other officers' use of guns and handcuffs and if those actions were such as the Bakers describe, the testimony, while conflicting, would support a finding that Armstrong violated the Bakers' Fourth Amendment rights.

Although Armstrong did not personally use excessive force or order its use, we conclude that there is sufficient evidence to permit an inference that Armstrong knew of and acquiesced in the treatment the Bakers were receiving at the hands of the other officers acting under his supervision.  The Bakers said they were handcuffed while outside.  Armstrong said he "hollered" out the door of the apartment "to bring those people in."  Tiffany Baker testified that they were brought into the kitchen and her testimony is sufficient to support a finding that the Baker women sat in the kitchen for about ten minutes in handcuffs.  Mrs. Baker said a gun was pointed at her head.  Corey

Baker was taken to a bedroom in handcuffs and was searched. He testified that he remained handcuffed after he had returned to the kitchen and for some five minutes more until he was told it was all right to leave. Tiffany Baker also testified that Corey had his handcuffs on until the Bakers were released and told to go outside. It was a small apartment.[4] Armstrong stated that there was an open doorway from the room in which he was speaking to Clementh to the kitchen or dining room where the Bakers were. These few facts, taken together, are sufficient to allow a factfinder to infer that Armstrong was aware of how the Bakers were being treated, but permitted that treatment to continue for some amount of time before he stopped it.

This evidence satisfies at the summary judgment stage the standard our cases require for supervisory liability, that is "actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d at 1207; Andrews, 895 F.2d at 1478.[5] We believe that actual knowledge can be inferred from circumstances other than actual

---

[4]Armstrong stated that the apartment had only three rooms and a bath. Corey Baker's testimony indicates that there was a living room, kitchen, and more than one bedroom.

[5]We note that other circuits have developed broader standards for supervisory liability under section 1983. For example, the Eighth Circuit has held that "actual knowledge is not an absolute prerequisite" and that "reckless disregard on the part of a supervisor will suffice." Hall v. Lombardi, 996 F.2d 954, 961 (8th Cir. 1993) (quoting Howard v. Adkison, 887 F.2d 134, 138 (8th Cir. 1989)), cert. denied, 114 S.Ct. 698 (1994). See Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 92 (1st Cir. 1994); Rascon v. Hardiman, 803 F.2d 269, 274 (7th Cir. 1986).

sight.[6]  In this case we think the inference of knowledge could arise from Armstrong's "hollering" instructions outside to others who were holding the Bakers in handcuffs and at gunpoint; and his presence in a small apartment where the Baker women were being held in one room and Corey Baker was undergoing a protracted search in another.  In sum, this evidence is sufficient to withstand defendants' request for summary judgment.

The Bakers have not shown that Armstrong was a policymaker for Monroe Township, and they have not shown any evidence of Monroe Township practices regarding handcuffing people found at the site of a search or pointing guns at them. Their accounts of what happened in this particular case do not establish a custom or usage.  City of Canton, 489 U.S. at 1206. To the extent the record reveals any policy or custom of Monroe Township regarding handcuffs or pointing guns, it exonerates the Township, for Officer Armstrong stated that it would not have been appropriate to handcuff the Bakers, and denied knowing that anyone had handcuffed the Bakers or pointed guns at them. Moreover, he expressed the belief that his approach would have been widely shared by other police.  The Bakers have failed to show that Monroe Township caused their injuries.


**D.**

---

[6]Although bound by Third Circuit precedent, we believe that the dissent takes too narrow a view of actual knowledge, apparently contending that Armstrong had to actually see the activities to have actual knowledge of them.

Finally, we reach the search of Corey Baker and of Mrs. Baker's purse. Corey Baker said he was taken into a back room and searched. He said: "They searched me, took my wallet out of the back pocket and went all through it, and they made me take off my shoes, checked down inside, checked my socks and stuff." He said he was forced to take his shirt off and that police went through his pants pockets. Mrs. Baker said her "pocketbook was snatched and emptied out on the ground" while she was still outside.

As we have said, the actions to control the Bakers while the search warrant was executed were justified under Michigan v. Summers and Terry. A search of Corey's and Mrs. Baker's persons is not supported by either line of cases. The Supreme Court has recently reiterated that when a protective search goes beyond a search for weapons and becomes a search for evidence, it is no longer valid under Terry. Minnesota v. Dickerson, 113 S. Ct. 2130, 2136 (1993). The alleged actions in this case were full-scale searches for evidence, having nothing to do with a limited Terry-frisk, and having no probable cause justification. These allegations constitute Fourth Amendment violations.

As with the use of excessive force, the key question about the searches is whether Armstrong and Monroe Township were responsible. Armstrong denies that the Bakers were subjected to even a limited Terry-frisk.

> Q: Were Mrs. Baker or her children subject to any type of body search while they're in the house?

A:    No, sir.

Q:    Would it have been routine that they
      would have been subject to any type of
      pat-down search?

                    . . . .

A:    No, sir.

Q:    Would it have been routine for the
      officers securing them to have searched
      their pocketbooks?

A:    No, sir.


        However, as with the handcuffing and use of guns, we conclude that there is a conflict in testimony as to Armstrong's knowledge about the search of Corey Baker.  Corey testified that police took him through the kitchen and the living room to the first bedroom, where they searched him for five to ten minutes. Police went through his wallet, made him take off his shoes and shirt, and checked his socks.  Armstrong's mere presence in this small apartment where Corey Baker was undergoing this protracted search was sufficient to permit an inference that he was aware of the evidentiary search.  Therefore, the district court erred in entering summary judgment for Armstrong on this claim.

        On the other hand, the search of Mrs. Baker's pocketbook occurred outside, while Armstrong was inside securing the apartment.  We do not believe Armstrong can be held accountable for this search, for the evidence does not support the inference that Armstrong knew what was happening outside the

apartment.  Consequently, Armstrong was entitled to judgment on Mrs. Baker's search claim.

As with the handcuffing and use of guns, we see no evidence that Monroe Township expressly or tacitly authorized either of the searches.  Therefore, there can be no liability as to the Township.

## IV.

We reverse and remand for trial on the issue of whether Armstrong acquiesced in the alleged use of excessive force (in handcuffing the Bakers and pointing guns at them) and in the search of Corey Baker, and for the district court to consider whether Tiffany Baker should be granted leave to amend her complaint under Rule 15.  In all other respects, we affirm the judgment of the district court.

Baker v. Monroe

No. 94-5069

Alito, Circuit Judge, concurring and dissenting.


I join parts I, II, IIIA, and IIIB of the opinion of the court. I cannot, however, join parts IIIC and IIID, which reverse the award of summary judgment in favor of Monroe Township Police Office Robert Armstrong with respect to the plaintiffs' claims regarding the search of Corey Baker and the alleged use of excessive force during the Bakers' detention. In my view, a careful analysis of the applicable law and the summary judgment record reveals that the district court's award of summary judgment with respect to these claims should be affirmed.


1.

On June 1, 1990, Armstrong applied for a "no knock" warrant to search an apartment in Williamstown, New Jersey, "and persons found therein." App. at 248-51. In support of this application, Armstrong submitted an affidavit stating: that on May 24, 1990, a confidential informant told him that Cheryl Woods and her boyfriend, "Clem" (later identified as Inez Baker's son Clementh Griffin), were distributing cocaine from this apartment; that on May 27 Armstrong sent a confidential informant into the apartment to make a controlled purchase of cocaine from Cheryl Woods and that the confidential informant did so; that on May 29 a concerned citizen informed Armstrong that "numerous young

adults and juveniles" had been going into the apartment to purchase cocaine; and that on May 31 Armstrong conducted a short surveillance of the apartment and observed young people entering and leaving the apartment in a manner that, in Armstrong's experience, was indicative of drug distribution activity. Id. Armstrong's application was granted, and the court issued a "no-knock" warrant. Id. at 147.

At about 8:25 p.m. that evening, Armstrong and a team of officers under his direction executed the warrant. Id. at 63, 95. Armstrong identified the other officers as Sergeant R. Ferris and Lieutenant T. Watson of the Gloucester County Prosecutor's Office and Special Agents K. Donnelly and J. Vitaletti of the federal Drug Enforcement Administration. Id. at 59-60. Upon arriving at the apartment, the officers quickly left their unmarked van and ran toward the door with their guns drawn. Id. at 46, 62-64. At precisely the time when the officers arrived, the plaintiffs in this case were on or near the steps of the apartment. Corey Baker, age 17, was on the steps. Tiffany Baker, age 15, was behind him at the bottom of the steps, followed by her older sister, Jacquine Anderson, and their mother, Inez Baker (collectively "the Bakers"). Id. at 62, 65, 119, 129. Armstrong was the first of the officers to leave the van and reach the door of the apartment. Id. at 62, 65-66. He stated that when he saw the Bakers he could not tell whether they were arriving at or leaving the apartment and that he had no idea who they were or what their connection might be with the apartment. Id. at 78-79, 85. He added that he did not know

whether one of them might be Cheryl Woods and that he thought that one of them might possibly be armed. Id. at 75, 79. As Armstrong neared the Bakers, he shouted for them to get down. Id. at 62. He then ran past them and entered the apartment. Id. at 62, 66, 131.

Some of what happened next outside the apartment is in dispute. In his deposition, Armstrong stated that two of the officers remained outside with the Bakers. Id. at 77. In their depositions, the Bakers agreed that some officers (not including Armstrong) remained outside, but the Bakers estimated that as many as 20 officers participated in the raid. Id. at 119, 123, 129, 131. The Bakers stated that some of the officers who remained outside (none of whom apparently were deposed) handcuffed them, kept them on the ground, and pointed guns at them. Id. at 120-23, 131-32. In addition, Inez Baker stated that one of these officers took her purse, emptied its contents on the ground, examined the contents, put them back in the purse, and then returned the purse to her. Id. at 117.

Inez Baker estimated that she and the children accompanying her remained outside the apartment for about ten minutes. Id. at 366. There is no evidence that Armstrong was present outside the apartment at any time during this period. Nor is there any evidence that Armstrong looked out at the area where the Bakers were held, that he would have been able to see the Bakers from inside the apartment through any door or window, or that he had any communications during this period with any of the officers who were outside.

While the Bakers remained outside the apartment, Armstrong and the other officers who had entered secured the premises and its occupants, Cheryl Woods and Clementh Griffin. Id. at 67, 98, 115–16, 122. According to Armstrong, he then shouted out the door "to bring those people in." Id. at 98. The Bakers were brought into the kitchen, which was the first room reached through the door. Id. 71, 84, 112, 124–26. The Bakers said that they were handcuffed when they were led into the apartment, and Inez Baker said that one of the officers pointed a gun at her during this time. Id. at 112–14, 123–25, 132. However, none of the Bakers said that Armstrong was in the kitchen when they were brought in. Id. at 113. Corey Baker stated that he was taken through the kitchen and living room to the first bedroom. Id. at 132. There, he said, several officers (not including Armstrong) subjected him to a thorough search before they returned him to the kitchen. Id. at 134–35.

Armstrong stated that after the Bakers were brought in, he went to the kitchen, spoke to Inez Baker, and explained why she and the children accompanying her had been ordered to get down. Id. at 68–69. At this point, he said, he still did not know who the Bakers were. Id. He stated that he then went to another room and was speaking with Clementh Griffin when he heard something that Inez Baker was saying. Id. at 69. According to Armstrong, he asked Sergeant Ferris who Inez Baker was and was told that she was Clementh Griffin's mother. Id. Armstrong stated that he asked Clementh Griffin whether his mother and the other Bakers had "anything to do with what may be found in [the]

house," and Griffin answered "no."  Id.  Armstrong said that he then went back to the kitchen, explained to Inez Baker what had occurred, apologized for the inconvenience, and told her that she and her children (other than Clementh Griffin) were free to go. Id.  Similarly, Inez Baker said that, after she and the children accompanying her had been kept in the kitchen for some time, Armstrong came out of another room and said that they should be released.  Id. at 114.  She and Armstrong both estimated that about 15 minutes had then elapsed from the time when she had been brought into the apartment.  Id. at 71, 115.

Armstrong said that he never saw Inez Baker in handcuffs. (He does not appear to have been asked whether he ever saw the other Bakers in handcuffs.)  Armstrong also stated that he never saw guns pointed at any of the Bakers.  Id. at 67-68, 70.

II.

Search of Corey Baker.  Summary judgment was properly entered in favor of Armstrong on this claim for two separate reasons.

A.  First, the terms of the search warrant doom this claim.  The warrant (which is reproduced in full as an appendix to this opinion) consisted of a printed form with typewritten entries (possibly made prior to the submission of the application to the judge) and handwritten entries (apparently made by the

judge).[7]  Paragraph one recited that Armstrong had applied "for a search warrant for the (x) premises (x) person (x) vehicle described below."  App. at 147.  Paragraph two commanded Armstrong and other officers "to search the (x) premises described below (x) person(s) described below (x) vehicle described below."  Id.  Paragraph 4 stated:

> The following is a description of the (x) premises, (x) person, (x) vehicle to be searched:
>
> an apartment located in an apartment building at 607 South Main Street, Williamstown, New Jersey, a three (3) story wood frame residence located on the corner of South Main Street and Virginia Avenue, having a parking lot on the Virginia Avenue side and directly across the street from the Williamstown Fire Company.

Id.

To my mind, by far the best interpretation of these provisions of the warrant is that they authorized a search of, not only the premises of the apartment, but also any persons found on the premises.  That the judge who signed the warrant intended to authorize a search of some person or persons seems perfectly clear, since the space for "person(s)" in paragraph 2 and the space for "person" in paragraph 4 were both marked with x's.  (Are we to assume that both these x's were mistakes?)  The only remaining question, then, is the identity of the person or persons who were to be searched, and even if we look only at paragraph 4, the answer to this question seems reasonably plain.

---

[7] In the quotations from the warrant that appear below, the printed text is in regular type, and the typewritten text is underlined.

Since paragraph 4 is supposed to describe "premises," "person[s]," and "vehicle[s]," but expressly refers only to the premises of the apartment, the most reasonable interpretation is that the warrant authorized a search of the premises and any persons or vehicles found on the premises.

This interpretation is reinforced by paragraphs one and two of the warrant and the warrant application. As previously noted, Armstrong applied for authorization to search the premises of the apartment "and persons found therein." Id. at 251. Paragraph one of the warrant, which paraphrased the terms of Armstrong's application, stated that he had applied "for a search warrant for the (x) premises [and] (x) person(s) . . . described below." Id. at 147. Thus, paragraph one clearly equated the phrase "persons found therein" with the phrase "persons . . . described below." Paragraph two then authorized a search of the "(x) premises [and] (x) person(s) . . . described below." Id. Consequently, paragraph two authorized precisely what, according to paragraph one, Armstrong sought -- and that was permission to search the premises "and persons found therein." Id. at 25.

For these reasons, I believe that the warrant authorized a search of any persons found on the premises. This interpretation is consistent with all of the language of the warrant, and it gives effect to and harmonizes all of the warrant's provisions. I acknowledge, of course, that it would have been better draftsmanship to have referred specifically in paragraph 4 to any persons found on the premises, but for

practical purposes the scope of the search that was authorized seems to me quite apparent.

The majority's alternative interpretation is completely unpersuasive. The majority writes:

> [T]he only common-sense interpretation of the [warrant] is that no one ever bothered to complete it to include specified persons as well as premises. This flawed document does not demonstrate that the magistrate determined search of any particular person to be justified.

Maj. typescript at 3 n.1. From this paragraph, I take it that the majority believes that the municipal judge intended to authorize a search of <u>named</u> <u>persons</u> but neglected to ensure that the names of these persons were included in the warrant. However, this interpretation requires the assumption that the judge made a serious and basic error. Moreover, this interpretation is completely inconsistent with the search warrant application, which did not request authorization to search any <u>named persons</u> but, instead, sought permission to search "any persons found" on the premises. Thus, in order to accept the majority's interpretation, one must assume that the judge who issued the warrant rejected Armstrong's request for authorization to search any persons found on the premises, decided instead to authorize a search of named individuals (although such authorization had not been sought), and then forgot to ensure that these individuals were identified in the warrant. This interpretation, far from being "the only common-sense interpretation" of the warrant, seems to me far-fetched.

After advancing this interpretation of the warrant, the majority contends that if the warrant were interpreted to authorize the search of any person or persons it would violate the Fourth Amendment's particularity requirement.[8]  After noting that the warrant did not name any particular person or persons, the majority continues:

> Nor did the language in the description refer to a place and any or all "persons found therein" as did the warrants before the courts in State v. Sims, 382 A.2d 638, 642 (N.J. 1978) and State v. DeSimone, 288 A.2d 849, 850 (N.J. 1972).  The Fourth Amendmnet requires that the warrant particularly describe the place to be searched and the persons to be seized.  The face of the warrant demonstrates its failures to meet the requirement of the Fourth Amendment.

Id.  This argument is wrong and is not supported by either State v. Sims, 382 A.2d 638, 642 (N.J. 1978), or State v. DeSimone, 288 A.2d 849, 850 (N.J. 1972).

Sims involved the application of legal principles articulated in DeSimone.  There, the New Jersey Supreme Court rejected the argument that a warrant authorizing a search of all persons found on described premises violated the Fourth Amendment's particularity requirement.  Writing for the court, Chief Justice Weintraub observed:

> With regard to the Fourth Amendment demand for specificity as to the subject to be searched, there is none of the vice of a general warrant if the individual is thus identified by physical nexus to the ongoing criminal event itself.  In such a setting, the officer executing the warrant has neither the authority nor the

---

[8]The Fourth Amendment, of course, provides that warrants shall not be issued unless "supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized" (emphasis added).

opportunity to search everywhere for anyone violating a law. So long as there is good reason to suspect or believe that anyone present at the anticipated scene will probably be a participant, presence becomes the descriptive fact satisfying the aim of the Fourth Amendment. The evil of the general warrant is thereby negated. To insist nonetheless that the individual be otherwise described when circumstances will not permit it, would simply deny government a needed power to deal with crime, without advancing the interest the Amendment was meant to serve.

288 A.2d at 850.

Instead of presenting a "particularity" question, Chief Justice Weintraub wrote, a warrant authorizing a search of any person found on described premises presents a question of probable cause:

On principle, the sufficiency of a warrant to search persons identified only by their presence at a specified place should depend upon the facts. A showing that lottery slips are sold in a department store or an industrial plant obviously would not justify a warrant to search every person on the premises, for there would be no probable cause to believe that everyone there was participating in the illegal operation. On the other hand, a showing that a dice game is operated in a manhole or in a barn should suffice, for the reason that the place is so limited and the illegal operation so overt that it is likely that everyone present is a party to the offense. Such a setting furnishes not only probable cause but also a designation of the persons to be searched which functionally is as precise as a dimensional portrait of them.

Id.

This analysis is specifically approved in Professor LaFave's treatise:

Unquestionably, the DeSimone rationale is correct. A search warrant authorization to search all persons found within a specifically described place is not lacking in particularity in the sense that the

executing office will be unable readily to determine to whom the warrant applies.  Rather, the question is whether there is sufficient particularity in the probable cause sense, that is, whether the information supplied the magistrate supports the conclusion that it is probable anyone in the described place when the warrant is executed is involved in the criminal activity in such a way as to have evidence thereof on his person.  If the evidence tendered to the magistrate supports such a conclusion, then the search-all-persons-present warrant is unobjectionable.  If the evidence does not support such a conclusion, then the searches of those present find no justification in the search warrant.

2 Wayne R. LaFave, Search and Seizure § 4.5e at 231 (1987) (footnotes omitted).

I agree with DeSimone and with Professor LaFave's analysis, and I therefore think that the validity of the warrant at issue in this case depends on whether the search warrant application established probable cause to believe that all persons found on the premises of the apartment were involved in the regular drug activity that had been going on at that location.  The majority says nothing with respect to this question, but I believe that the requisite probable cause was shown.

The holdings in State v. DeSimone, supra, and State v. Sims, supra, both of which seem to me to be correct, serve to frame the question presented by the warrant involved here.  In DeSimone, the police had probable cause to believe that a particular car was regularly used to drop off "policy" slips, a warrant was issued to search the car and "all persons found therein," and the New Jersey Supreme Court upheld the warrant,

observing that there was probable cause to believe that any person found in the car "whether driver or passenger would be involved in the criminal operation." 288 A.2d at 854. In Sims, by contrast, the police intercepted a single telephone call to a service station owned by "one Robert (Bob) Quinlan," and during this call "[t]he caller placed two illegal horse bets with a person identifying himself as Bob." 382 A.2d at 641. A warrant was issued to search all persons found in the station, but the New Jersey Supreme Court concluded that there was no "probable cause to believe that all persons who might be found on the premises of the service station were engaged in illegal gambling." Id.

In the case now before us, the police had evidence that the apartment had been the scene of frequent drug sales to a large number of buyers for some time. Thus, there was probable cause to believe that anyone living in the apartment was involved in this activity. There was also a good likelihood that visitors to the apartment were drug buyers. While it was certainly possible that there would also be some innocent visitors to the apartment (such as the Bakers), I think that there was probable cause to search anyone found on the premises.

There is considerable authority supporting this conclusion. In the Commonwealth v. Smith, 348 N.E.2d 101 (Mass. 1976), the Supreme Judicial Court of Massachusetts upheld a provision of a warrant authorizing a search of any person found in an apartment. The affidavit submitted in support of the warrant stated that an informant had recently seen heroin sales

within the apartment and that police officers conducting a surveillance of the apartment had seen known drug traffickers entering and leaving.  Id. at 106.  "From these asserted facts and fair inferences drawn therefrom," the court stated, "it was permissible to conclude that it was probable that any person in the apartment was a participant in the trafficking in heroin there."  Id.

In State in Interest of L.Q., 566 A.2d 223 (N.J. Super. Ct. App. Div. 1989), the court upheld a comparable warrant provision based on facts strikingly similar to those present in the case now before us.  The warrant was issued based on an affidavit stating that surveillance of the residence had revealed comings and goings characteristic of drug sales and that a controlled purchase of drugs had been made at the residence.  Id. at 223-24.  The court wrote:

> The evidence was sufficient to create a well-grounded suspicion or belief that numerous sales of [drugs] were being conducted in the premises.  Although the affidavit did not exclude the possibility of other activities on the premises, the description of the activity actually observed provided a firm foundation for the suspicion or belief that any person in the private premises was involved in the overt unlawful activity of sale and possession of cocaine.  Such a suspicion or belief is not limited to persons already there when the police arrive, but reasonably extends to a person who enters the premises during the search.

Id. at 226 (footnote omitted).

The Superior Court of Pennsylvania has handed down similar decisions.  See Commonwealth v. Graciani, 554 A.2d 560, 561-62 (Pa. Super. 1989); Commonwealth v. Heidelberg, 535 A.2d 611, 615 (Pa. Super. 1987).  So have courts in other

jurisdictions.  See, e.g., Gonzales v. State, 761 S.W.2d 809, 811 (Tex. App. 1988); People v. Betts, 456 N.Y.S.2d 278, 279 (1982). In accordance with these authorities, I conclude that the warrant in this case was supported by probable cause to search any one found on the premises.[9]

   B.  Moreover, even if the warrant did not authorize the search of Corey Baker and that search was illegal, Armstrong was still entitled to summary judgment pursuant to our court's well established standard for individual liability in an action under 42 U.S.C. § 1983.  In such an action, we have held, an individual defendant is liable only if he or she has "personal involvement in the alleged wrongs."  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."  See also Keenan v. Philadelphia, 983 F.2d 459, 466 (3d Cir. 1992); Andrews v. Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990).[10]  Id.  Here, there is no suggestion in the

_____

   [9]I do not reach -- and I do not read the majority opinion as reaching -- the qualified immunity defense pled in Armstrong's answer.  See App. at 29; Anderson v. Creighton, 483 U.S. 635 (1987).  The district court did not base its award of summary judgment on this ground, and Armstrong did not raise this issue on appeal as an alternative ground for affirmance.  The majority has not addressed this issue, and accordingly, any consideration of this issue will have to await further proceedings.

   [10]Although the majority hints, see Maj. typescript at 14 n.5, that it likes the law of some other circuits better than our own, the majority fails to show how the claims at issue here could survive summary judgment under the precedents it cites. The majority states that other circuits, rather than demanding "actual knowledge," have held that "reckless disregard on the part of a supervisor will suffice."  Id. (quoting Hall v. Lombardi, 996 F.2d 954, 961 (8th Cir. 1993)).  However, the

summary judgment record that Armstrong personally directed the other officers to search Corey Baker, and there is insufficient evidence to show either his "actual knowledge" or "acquiescence."

As for actual knowledge, although the majority thinks that a rational trier of fact could infer, based solely on the small size of the apartment, that Armstrong was aware that the search of Corey Baker was taking place, I am doubtful about this.[11] But in any event, even if a rational trier of fact could infer that Armstrong was aware that Corey Baker was being searched, I think that the "actual knowledge" requirement demands something more -- viz., knowledge that the other officers lacked a lawful basis for the search.

A simple hypothetical demonstrates the need for this additional showing. Suppose a supervisory policy official happened to observe subordinates from some distance while they were carrying out a Terry frisk. If it turned out that this frisk was unlawful because the frisking officers lacked reasonable suspicion, could the supervisory official be held liable under Section 1983 simply because he or she had actual

---

majority makes no effort to demonstrate that there is sufficient evidence in the summary judgment record to establish that Armstrong was reckless in failing to recognize that the other officers were acting unlawfully and, as I attempt to show below, Dissenting typescript at 15-19, I do not think that the summary judgment record contains such evidence.

[11] The search of Corey Baker would not necessarily have taken a long time, and therefore unless Armstrong happened to look into the bedroom where the search was allegedly taking place during that relatively brief period, he would not have seen the search.

knowledge that the frisk had occurred?  I think the answer must clearly be "no."  If the supervisor did not know (or at least have cause to know)[12] that reasonable suspicion was lacking, the supervisor should not be liable.

Here, there is no direct or circumstantial evidence that Armstrong possessed such knowledge.  All that the record shows is that Armstrong had seen Corey Baker, a 17 year old, a few steps from the door of an apartment believed to be a center of cocaine sales to young people, that Corey Baker was then held outside for perhaps ten minutes by other officers, and that immediately thereafter Corey Baker was taken into the apartment to the first bedroom and searched.  From these facts, it cannot reasonably be inferred that Armstrong knew (or should have known) that the other officers did not have a legitimate basis for searching Corey Baker -- such as consent or probable cause based on a pat down or statements made by other persons on the scene. Nor can it be inferred that Armstrong acquiesced in the allegedly illegal conduct.  Accordingly, the district court was correct in granting summary judgment in favor of Armstrong on the claim grounded on the search of Corey Baker.

---

[12]As previously noted, our precedents require "actual," not constructive knowledge.  In the discussion above, I do not suggest that constructive knowledge is sufficient.  Rather, I argue that it would be manifestly unjust to hold a supervisor liable when he or she lacks even constructive knowledge.

III.

Excessive Force.  I now turn to the claim based on the use of excessive force during the Bakers' detention. The majority holds -- and I agree -- that the detention of the Bakers during the execution of the warrant was itself proper.  The majority concludes, however, that the Fourth Amendment was violated by the use of handcuffs and guns during that detention and that the evidence is sufficient to sustain a judgment against Armstrong for this violation.

Claims that law enforcement officers used excessive force in the course of an arrest or investigatory stop must be analyzed under the "reasonableness" standard of the Fourth Amendment.  Graham v. Connor, 490 U.S. 386, 396 (1989).  The Supreme Court has explained:

> Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.  Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," . . . however, its proper application requires careful attention to the facts and circumstances of each particular case. . . .
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

Id.  (citations omitted).

If an officer is making an arrest, it seems to me that the use of handcuffs will always be reasonable.  As for the use of handcuffs during an investigatory stop and the drawing of a

gun during an arrest or an investigatory stop, the cases hold that reasonableness must be judged based on the particular circumstances of the case. See, e.g., Foote v. Dunagan, 33 F.3d 445, 448-49 (4th Cir. 1994) (reasonable to draw gun during investigatory stop; United States v. Fountain, 2 F.3d 656, 666 (6th Cir.), cert. denied, 114 S. Ct. 608 (1993) (reasonable to draw gun and use handcuffs during investigatory stop); Tom v. Voida, 963 F.2d 952, 958 (7th Cir. 1992) (reasonable to kneel and attempt to handcuff during investigatory stop); Courson v. McMillian, 939 F.2d 1479, 1493 (11th Cir. 1991) (reasonable to point shotgun and direct person to lie on ground during investigatory stop); United States v. Haye, 825 F.2d 32, 35 (4th Cir. 1987) (reasonable to wrestle to ground and use handcuffs during investigatory stop); United States v. Nargi, 732 F.2d 1102, 1106 (2d Cir. 1984) ("`[T]here is no hard and fast rule concerning the display of weapons' in investigative stops."); United States v. Taylor, 716 F.2d 701 (9th Cir. 1983) (reasonable to draw gun and use handcuffs during investigatory stop); cf. Black v. Stephens, 662 F.2d 181, 188-89 (3d Cir. 1981), cert. denied, 455 U.S. 1008 (1982) (officer's pointing of gun during traffic altercation violated due process).

In this case, therefore, in order to hold Armstrong liable for the improper use of handcuffs and guns by the other officers, it must be shown (a) that Armstrong knew that the other officers used handcuffs and guns and (b) that Armstrong knew that the other officers lacked reasonable grounds for their conduct.

I believe that the summary judgment record is sufficient to establish the first element described above.[13] I do not think, however, that the record supports the inference that Armstrong knew, at any point appreciably before he ordered the Bakers' release, that the other officers lacked a reasonable basis for handcuffing the Bakers or holding them at gunpoint. Moreover, the record does not show that Armstrong recklessly failed to inquire about the basis for the other officers' actions. The record does not establish how much time elapsed between the point when he first saw that the Bakers were handcuffed and held at gunpoint and the point when he ordered their release, but it appears that this period must have been less than 15 minutes, see supra note 3, and the record shows that Armstrong was busy during this time questioning Clementh Griffin. Accordingly, I do not see how Armstrong could be held to have had "actual knowledge" of or to have "acquiesced" in the constitutional violations that the other officers allegedly committed.

---

[13]Since we are reviewing a grant of summary judgment, I agree with the majority that we must accept the Bakers' statements that handcuffs and guns were employed. In addition, while I question (for reasons explained above in connection with the alleged search of Inez Baker's purse) whether it is reasonable to infer that Armstrong saw what was done to the Bakers outside the apartment, I think that the record permits the inference that he saw that the Bakers were handcuffed when they were brought into the house and that he saw that a gun was pointed at Inez Baker while she was in the kitchen.

## IV.

For these reasons, I believe that the district court correctly granted summary judgment in favor of Armstrong. I share the majority's sympathy for the Bakers' plight. It was a most unfortunate coincidence that they happened to arrive at the scene of a drug search just as the officers were arriving to execute the warrant. Their experience must have been terrifying. It is also most unfortunate that, prior to the expiration of the statute of limitations, the Bakers did not ascertain the identities of the officers who allegedly engaged in the conduct that is claimed to have violated their constitutional rights. Sympathy for the Bakers, however, does not justify a decision that ignores the deficiencies in the summary judgment record. I therefore dissent from the decision of the majority insofar as it reverses the district court's award of summary judgment.

APPENDIX [14]

SUPERIOR COURT OF NEW JERSEY

STATE OF NEW JERSEY

     vs                                   SEARCH WARRANT

Cheryl Woods

     Defendant

To _Detective Robert Armstrong_ and/or any officer of Gloucester County Prosecutor's Office, any officer of the New Jersey State Police or any officer of any Police Department having jurisdiction:

1. This matter being opened to the Court by _Detective Robert Armstrong_ of _Monroe Township_, on application for the issuance for a search warrant for the (x) premises (x) persons (x) vehicle described below, and the Court having reviewed the (x) affidavit of ( ) testimony under oath of the said _Detective Robert Armstrong_ and being satisfied therefrom that located therein or thereon are:

> evidence of possession and distribution of controlled dangerous substances, including, but not limited to, controlled dangerous substances and relating paraphernalia, records, documents and other items relating to the possession and distribution of controlled dangerous substances.

and that probable cause exists for the issuance of such warrant:

2. YOU ARE HEREBY COMMANDED to search the (x) premises described below (x) person(s) described below (x) vehicle

---

[14]Printed text is in regular type. Typewritten text is underlined. Handwritten text is italicized.

described below and to serve a copy of this warrant on such person or on the person in charge or control of such premises;

3.  YOU ARE HEREBY ORDERED, in the event you seize any of the above described articles, to give a receipt for the property so seized to the person whom it was taken or in whose possession it was found, or in the absence of such person to leave a copy of this warrant together with such receipt in or upon the said premises from which the property is taken.

4.  The following is a description of the (x) premises, (x) person, (x) vehicle to be searched:

an apartment located in an apartment building at 607 South Main Street, Williamstown, New Jersey, a three (3) story wood frame residence located on the corner of South Main Street and Virginia Avenue, having a parking lot on the Virginia Avenue side and directly across the street from the Williamstown Fire Company.

5.  Special instructions (Time Limitations, etc.):

Anytime day or night – no knock

Given and issued under my hand at  10  o'clock  p  m., this   First   day of   June   , 1991.