FUENTES, Circuit Judge,
dissenting.
I dissent in this case because I disagree with the majority’s view that, even giving the plaintiffs the benefit of all reasonable inferences, there are no material issues of fact for a jury to consider.
Plaintiff/Petitioners Heggenmiller[5] and Davis were inmates at EMCF in 1998 when they were repeatedly sexually assaulted by a prison guard. In the preceding five years, at least five other female inmates were also sexually assaulted by various guards at EMCF. Deposition testimony offered by plaintiffs suggests up to five additional incidents — for a total of ten sexual assaults between 1994 and 1998.
In 1991, shortly before this series of sexual assaults began, the New Jersey Department of Corrections was ordered by the Czizmada Consent Decree (“Decree”) to assign officer positions at EMCF without reference to gender, with the exception of certain especially sensitive posts. It was simultaneously ordered to institute a program to train officers for gender neutral assignments and to teach them about privacy concerns and gender sensitivity. EMCF gender-neutralized its officer assignments, but it did not add training about gender sensitivity and privacy to its curriculum. Instead, it deemed the training it already had in place adequate to train the male guards newly introduced into the female inmate facility. In fact, the record suggests that EMCF did not alter or update its curriculum in any way in response to the Decree.[6] Nor did it do so after any of the five sexual assaults that were uncovered in the five years before Heggenmiller and Davis were assaulted.
*249 In my view, a jury could well conclude that the assaults on Heggenmiller and Davis were caused by the defendants’ failure to implement the provisions of the 1991 Czizmada Consent Decree at any time before plaintiffs were assaulted in late 1998.
The pattern of criminal sexual activity at EMCF, and the circumstances surrounding it, are important under the four-part test of Sample v. Diecks, 885 F.2d 1099 (3d Cir.1989), that applies when a plaintiffs theory of liability is predicated on a defendant’s policymaking role, see Beers-Capitol v. Whetzel, 256 F.3d 120, 135 (3d Cir. 2001). Plaintiffs can meet the first prong, requiring them to show that defendants maintained a policy or practice that created an unreasonable risk of harm, by presenting “evidence that such harm has in fact occurred on numerous occasions.” Sample, 885 F.2d at 1118. Plaintiffs can also show, under the second prong, that defendants were aware of the unreasonable risk by presenting evidence that the alleged risk was “longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and [that] the circumstances suggest that the defendant-officials] being sued had been exposed to information concerning the risk and thus must have known about it.” Farmer v. Brennan, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); see also Baker v. Monroe Township, 50 F.3d 1186, 1193-94 (3d Cir.1995) (reversing summary judgment in part because factfinder could infer that defendant knew how plaintiffs were being treated by officers under his supervision). It is clearly for a jury to decide whether the series of sexual assaults at EMCF constitutes sufficient evidence under the first two prongs of Sample.
The majority opines that not all of the prior incidents at EMCF “were as serious as the rapes and assaults suffered by Heg-genmiller and Davis,” and suggests that “at least some of the prior incidents involved consensual sexual contact among guards.” However, the record indisputably shows at least five prior sexual relationships between guards and inmates, two of which continued after the inmates were released, and even defendants concede that prison inmates cannot legally consent to sex with their prison guards.[7] Moreover, as each of those five sexual assaults resulted in discharge and/or criminal convictions, they were almost certainly known to the defendants (indeed, defendants concede generally they were aware of prior sexual assaults).
Even if plaintiffs were able to show that defendants created an unreasonable risk of harm and were aware of that risk, the majority concludes that plaintiffs could not show deliberate indifference to that risk under the third prong of Sample. I would not foreclose such a factual finding. A reasonable jury could conclude that a failure to institute any gender sensitivity or privacy training — even after newly introducing male guards into a female prison, despite a series of sexual assaults by guards on prisoners, and notwithstanding a standing legal obligation to provide such training under the Consent Decree — was reckless. See Farmer, 511 U.S. at 836 (“acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk”).
*250 The majority endorses defendants’ own apparent belief that the training in place for EMCF guards was sufficient. Guards had indeed been provided important training long before the Consent Decree. A training manual allegedly similar to that used in 1994 (when Stewart Sella, the guard who sexually assaulted Heggenmil-ler and Davis, was trained) informed recruits that sexual contact with inmates is illegal. The manual also discusses fraternization and undue familiarity, though that section of the manual focuses on avoiding preferential treatment and does not address sexual relations with inmates. Inmates’ lack of privacy (together with their lack of choice) and its dehumanizing effects are also discussed in the manual, though the recommended ways to minimize dehumanization make clear that this training was not intended to prevent sexual harassment.
Plaintiffs Heggenmiller and Davis argue, however, that EMCF should have provided its guards with specific training on privacy rights and gender sensitivity. They claim that defendants should have instituted written guidelines to govern prison guards’ conduct in female inmates’ living quarters. The record shows that guards have thus far relied, with varying success, on their “common sense” as to these matters. The Chief of Training at the Correctional .Officers Academy, Sally Scheidemantel, had no recollection of specific training that dealt with privacy accommodations and, though the record includes a training text on “Supervision of Inmates by Employees of the Opposite Sex” dated March 1983, she was skeptical that this text, in a format that would not have been used by the Police Training Commission, was used during her tenure, which began in 1993.
The majority gives defendants much credit for firing any guard reported for engaging in sexual relations with inmates. While a failure to discharge sexual assailants would be truly shocking, the converse is insufficient, standing alone, to immunize defendants from § 1983 liability. Whatever the abstract merits of the training curriculum, or the theoretical sufficiency of a “zero-tolerance” discharge policy, a jury could conclude, based on the evidence in this case, that defendants should have responded to the pattern of sexual assaults at the prison by taking additional “reasonably available measures to reduce or eliminate that risk.” Berg v. County of Allegheny, 219 F.3d 261, 275 (3d Cir.2000). “If a [training] program does not prevent constitutional violations ... decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent [criminal] conduct by employees may establish ... the ‘deliberate indifference’ necessary to trigger ... liability.” Bd. of County Comm’rs v. Brown, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).
Finally, the majority determines, under the fourth prong of Sample, that defendants’ inaction did not cause Sella’s sexual assaults. The Supreme Court has acknowledged that “[predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder,” but it concluded that “judge and jury, doing their respective jobs; will be adequate to the task.” City of Canton v. Harris, 489 U.S. 378, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The causation element in a § 1983 claim, like other difficult questions of fact, is normally reserved for a jury. See Rivas v. City of Passaic, 365 F.3d 181, 193 (3d Cir.2004).
While it is impossible to know with absolute certainty whether Sella would have committed a sexual crime with better training, “the existence of a pattern of *251 [criminal] conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the ‘moving force’ behind the plaintiffs injury.” Brown, 520 U.S. at 407-08. The fact that the pattern of sexual misconduct at EMCF arose after the Decree may tend to show that the introduction of large numbers of male officers into female inmates’ living quarters without proper training caused a series of sexual assaults to occur. Moreover, in this case, the record suggests that Sella’s relationships with Heggenmiller and Davis were “gradual” in the sense that he first stared and glared at them, then “flirted” with them, and only later engaged in more explicit sexual activity. A jury could very well be persuaded that formal privacy guidelines would have thwarted Sella’s improper conduct before it escalated to the level of sexual assault.
Of course, we cannot say with certainty that a reasonable jury would find defendants liable on the facts of this case. But precisely because we cannot know whether a reasonable jury would hold prison administrators Terhune and Blackwell liable for the sexual assaults that took place in their prison, I would reverse the order of summary judgment and allow Jacqueline Heggenmiller and Tammy Davis to go forward with their claims. I respectfully dissent.

. For the sake of consistency, we use the majority’s spelling of petitioner's name.

. Chief of Training at the Correctional Officers Academy, Sally Scheidemantel, testified that officer training did not attempt to incorporate the requirements of the Decree. Defendant Blackwell testified that she did not recall any Department action designed to implement the training provisions of the Decree and implied that she herself did not take any such action.

. Under N.J.S.A. 2C-14:2(c)(2), "[a]n actor is guilty of sexual assault if he commits an act of sexual penetration with” anyone who “is on probation or parole, or is detained in a ... prison or other institution and the actor has supervisory or disciplinary power over the victim by virtue of the actor’s legal, professional or occupational status.”