[No. 20032-5-II. Division Two. January 23, 1998.]

THE STATE OF WASHINGTON, *Respondent*, v. KARL DENNIS KING, *Appellant*.

*Leslie E. Tolzin*, for appellant (appointed counsel for appeal).

 

*John W. Ladenburg, Prosecuting Attorney*, and *Kathleen Proctor, Deputy*, for respondent.

MORGAN, J. — Arguing violations of the Fourth and Fifth Amendments, Karl Dennis King appeals his conviction for theft of a gun. We affirm.

On July 22, 1995, Detective Tom Davidson of the Tacoma Police Department was investigating a homicide in which the perpetrator had used a large black handgun, possibly a .45 caliber or 9 millimeter. Because an informant had said the gun was at the apartment of a person named Neletta Sentwali, Davidson went there in the company of Officers Feddersen and Quilio. The three contacted Sentwali, and Davidson advised her that they "were looking for a gun and that the gun had been last seen in her apartment."[1] He asked for consent to search the apartment, and she responded, according to Davidson, that "she had no problem with us coming in and looking."[2] As far as the record shows, none of the officers knew whether anyone else was in the apartment.

Upon entering the apartment, Davidson, Quilio and Sentwali went to the living room, while Feddersen commenced a precautionary check of the other rooms. Feddersen's purpose was "to make sure that there were no hazards to the police that were inside the apartment."[3] Looking into a bedroom, Feddersen saw an unidentified man sitting on the bed. According to Feddersen, the man "was covering up an

---

[1] Report of Proceedings at 18-19.

[2] Report of Proceedings at 18-19.

[3] Report of Proceedings at 38.

item on the edge of the bed with a sheet," and "[u]nderneath the sheet appeared to be the outline of a handgun."[4] Concerned for his safety, Feddersen asked the man what he had just covered up, and the man said a gun. Immediately, Feddersen ordered the man away from the bed, handcuffed him, and patted him down for other weapons. Returning to the bed, Feddersen then seized a loaded .22 caliber handgun. Feddersen did not know if the handgun was the gun Davidson was seeking,[5] and his subjective reason for seizing it was officer safety.

Once in possession of the gun, Feddersen asked the man who he was, and whether the gun was his. The man replied that he was Karl King, and that the gun was his.

Feddersen ascertained the gun's model and serial number, apparently by viewing its exterior. He then radioed dispatch to run "the weapon for stolen" and "the defendant for warrants."[6] Within a short time, dispatch responded that the gun had been reported stolen; that King was currently on probation; and that King's probation prohibited him from possessing firearms. At this point, Quilio had joined Feddersen and King, but Davidson and Sentwali were still elsewhere in the apartment, looking for the gun used in the homicide.

After receiving dispatch's response, Feddersen told King he was under arrest. He also gave King the *Miranda* warnings for the first time. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3d 974 (1966).

After King had been taken to the police station, Feddersen or another officer gave the *Miranda* warnings a second time. At this point, according to the trial court's findings of fact, King "understood the ramifications of his statements . . . and agreed to talk to the police."[7] In response to police questions, King said that he had purchased

[4] Report of Proceedings at 24-25.

[5] It later turned out, as far as we can tell from the record, that the gun was not the one used in the homicide.

[6] Report of Proceedings at 27.

[7] Clerk's Papers at 55.

the gun on the street for $20, and that he knew the gun was probably stolen.

The State charged King with theft of the .22 caliber handgun. Before trial, he moved to suppress the gun and his statements to the police. At the ensuing suppression hearing, he testified that he and Sentwali were "in a relationship," that he was generally spending more time at her apartment than his own, and that he had stayed at Sentwali's for the two nights immediately preceding the night on which he was detained by Feddersen. The trial court refused to suppress the gun, King's statement identifying himself, and King's statements at the police station. It agreed, however, to suppress King's apartment house statement that the gun was his, because he had not yet received *Miranda* warnings. King was convicted as charged, following a bench trial on stipulated facts.

■ Because the officers were acting without a warrant, the State has the burden of justifying their actions.[8] To do that, it argues (1) that the officers were lawfully in the apartment because Sentwali "gave lawful consent to search";[9] (2) that Feddersen was entitled to detain King and the gun because, under *Michigan v. Summers*,[10] "[p]ersons present during a lawful search of the premises may be detained, identified, and asked preliminary questions";[11] (3) that *Miranda* warnings were not required before King answered questions at the apartment because, under *Berkemer v. McCarty*,[12] "[p]olice questioning in the context of an investigative detention does not require *Mi-*

---

[8]*State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996); *State v. Seitz*, 86 Wn. App. 865, 868, 941 P.2d 5 (1997); *see Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).

[9]Resp't's Br. at 6.

[10]452 U.S. 692, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981).

[11]Resp't's Br. at 4.

[12]468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

*randa* warnings";[13] and (4) that once King received the *Miranda* warnings, he validly waived his rights and agreed to speak. King responds that the detention of his person and the seizure of the .22 caliber handgun were not justified by probable cause, by an articulable suspicion of criminal activity, or by Sentwali's consent to search the apartment for the gun used in the homicide. He also claims that Feddersen's questions at the apartment violated *Miranda v. Arizona*, and that the violation tainted and rendered inadmissible all of his ensuing statements, including those made at the police station.

## I.

We first analyze whether Feddersen acted constitutionally when he detained King and seized the gun. To do that, we ask whether Feddersen, without engaging in an unreasonable search or seizure, (A) reached King and the gun; (B) initially seized King and the gun for purposes of officer safety; (C) observed the gun's model and serial number; (D) obtained information from dispatch that the gun had been reported stolen; and (E) seized the gun as evidence and placed King under custodial arrest.

## A.

Feddersen reached King and the gun without engaging in an unreasonable search or seizure. In general, an officer who enters a house with consent may go where the consent allows.[14] Even assuming, as King argues, that Sentwali consented only to the officers' searching for the gun used in the homicide, she did not limit her consent to particular rooms of the apartment; on the contrary, she authorized the officers to look through the entire apartment.[15] It

---

[13]Resp't's Br. at 4.

[14]*State v. Cotten*, 75 Wn. App. 669, 679, 879 P.2d 971 (1994), *review denied*, 126 Wn.2d 1004 (1995) (citing 3 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 8.1(c), at 160 (2d ed. 1987)); *State v. Gonzales*, 46 Wn. App. 388, 399, 731 P.2d 1101 (1986).

[15]See Finding of Fact 2; Clerk's Papers at 52.

follows that Feddersen had a right to be where he was when he first observed King and the gun, and also a right to be where he was when he first seized King and the gun.

### B.

Feddersen initially seized King and the gun without engaging in an unreasonable search or seizure. The Fourth Amendment secures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[16] Its "key principle," or "ultimate standard," is one of "reasonableness."[17]

This key principle has many specific applications. Of those involving the detention of persons, undoubtedly the most fundamental is that it is reasonable for an officer to detain a person indefinitely, e.g., for appearance in court or prosecution, only if the officer has probable cause to believe the person has committed a crime.[18] Another, narrower application is that even in the absence of probable cause, it is reasonable for an officer to detain a person briefly, for investigation, if the officer harbors a reasonable suspicion, arising from specific and articulable facts, that criminal activity is afoot.[19] A third, still narrower application is that even without probable cause or reasonable suspicion of criminal activity, it is reasonable for an officer executing a search warrant at a residence to briefly detain occupants of

---

[16]U.S. Const. amend. IV.

[17]*Summers*, 452 U.S. at 699-700 ("ultimate standard of reasonableness"); *Dunaway v. New York*, 442 U.S. 200, 219, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979) (White, J., concurring) ("key principle . . . is reasonableness").

[18]*County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991); *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975); *State v. Broadnax*, 98 Wn.2d 289, 293, 654 P.2d 96 (1982).

[19]*Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State v. Kennedy*, 107 Wn.2d 1, 5-6, 726 P.2d 445 (1986); *Broadnax*, 98 Wn.2d at 293-94; *State v. Gluck*, 83 Wn.2d 424, 426, 518 P.2d 703 (1974).

that residence, to ensure officer safety and an orderly completion of the search.[20]

■ ■ None of these specific applications precisely fits this case, because the issue here is whether police officers executing a *consent* search may briefly detain a person and a gun unexpectedly discovered in the course of that search. Thus, we revert to the Fourth Amendment's key principle of reasonableness. Following the lead of the United States Supreme Court, we apply that principle by " 'balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' " [21]

The circumstances faced by Feddersen obviously created a very strong need to briefly seize King's person and the .22 caliber handgun. The government has an important interest "in minimizing the risk of harm to . . . officers," and this includes "exercis[ing] unquestioned command of the situation."[22] Feddersen and the other officers were in the apartment to search for a murder weapon. When they entered, they had no reason to think anyone but Sentwali was present. Within moments, however, Feddersen unexpectedly encountered King, *with a gun on the bed beside him.* In an instant, the situation turned from one that was relatively routine to one that was potentially lethal, and a reasonable person in Feddersen's shoes would have reacted by temporarily seizing King and the gun until the situation could be sorted out.

On the other side of the coin, the initial invasion of King's interests was limited in both time and purpose. King's interests were his liberty interest in his person and

---

[20]*Summers*, 452 U.S. at 702-03, 705.

[21]*Terry*, 392 U.S. at 21 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 534-35, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967)); *see also Baker v. Monroe Township*, 50 F.3d 1186, 1192 (3rd Cir. 1995).

[22]*Summers*, 452 U.S. at 702-03.

his possessory interest in his gun.[23] Feddersen initially seized King and the gun only briefly, to exercise control over a potentially lethal situation and to ensure the safety of all concerned. If dispatch had not said the gun was stolen, King and the gun would have been released within a short time. Balancing the need to ensure the safety of the officers and Sentwali against the limited invasion of King's interests, we hold that the initial, temporary seizure of King's person and gun was constitutionally reasonable.

Insofar as our holding deals with the initial seizure of the gun, it is directly supported by *State v. Cotten.*[24] There, FBI agents went to a house occupied by a son and his mother. The mother was the only one home. She consented to a search of the home, but only for bomb-making materials. As the agents were searching, one of them found a shotgun in the son's upstairs bedroom. The agent had no reason to think the shotgun had anything to do with the making of bombs, but he nonetheless seized it and took it downstairs, where the mother had remained. There, he asked the mother whether she would expand her consent, and she agreed to the agents' taking the shotgun into their possession indefinitely. At the son's later trial for murder, he argued that the shotgun had initially been seized without probable cause to believe it was evidence of a crime, without his mother's consent, and without any other justification; therefore, he said, it should be suppressed. The trial court disagreed, and this court affirmed. Holding that the seizure of the shotgun was constitutionally reasonable, even though the agent had initially seized it without the mother's consent, we said that officers

> conducting a search pursuant to consent [have] the authority to briefly seize any dangerous weapons or instrumentalities that [they] may come across, to secure them by removing ammunition or otherwise rendering the weapon temporarily

[23]The interests on King's side do not include a privacy interest in the apartment, for it is undisputed that Sentwali validly consented to the officers' entering and looking for a murder weapon.

[24]75 Wn. App. 669, 879 P.2d 971 (1994).

unusable, and to keep the weapon with [them] while conducting the search. We are quick to point out that our holding is not meant to clothe the officer with authority to remove the weapon from the house. Rather, the seizure must be brief and is limited to ensuring that officers are able to protect themselves while in the residence. The character of their intrusion is limited and the justification is strong. A brief seizure of a weapon in such circumstance is not for evidence gathering purposes, but rather for purposes of protecting the searching officer's safety.[25]

Insofar as our holding deals with the initial seizure of King's person, it is tangentially supported by cases such as *People v. Glaser*,[26] and *Baker v. Monroe Township*.[27] Although the officers in those cases were searching pursuant to a warrant rather than consent, the key fact, as here, was surprise. To protect the safety of all concerned, the searching officers had to react instantly when they encountered unidentified persons, and they acted in a constitutionally reasonable manner when they briefly detained such persons until the situation could be sorted out.

Nothing we have said should be taken to mean that officers performing a consent search may *always* detain persons found on the premises, or that cases like *People v. Shields*[28] are incorrect. We hold only that Feddersen's initial seizure of King and the gun was constitutionally reasonable under the particular circumstances presented here.

Nor should anything we have said be taken to mean that we disagree with King's responses to the State's arguments. We agree that Sentwali did not consent to a seizure of King

[25]75 Wn. App. at 684.

[26]11 Cal. 4th 354, 902 P.2d 729, 45 Cal. Rptr. 2d 425 (1995).

[27]50 F.3d 1186 (3d Cir. 1995).

[28]205 Cal. App. 3d 1065, 252 Cal. Rptr. 849 (1988). In *Shields*, the management of a business employing more than 35 people asked the police to search the workplace for drugs. The police elected to do so in the middle of the workday, when most of the employees would be present. At the beginning of the search, moreover, the police detained 25 employees for whom they had neither probable cause nor articulable suspicion. Not surprisingly, these detentions were held to be constitutionally unreasonable.

or his gun, for she consented only to a search of the apartment for the gun used in the homicide.[29] We agree that when Feddersen initially seized King and the gun, he did not have an articulable suspicion that King was engaged in criminal activity; Feddersen had never before heard of King, and without more it is not a crime for an adult to possess, or even hide, a gun in his or her own home. We agree that when Feddersen initially seized King and the gun, he had no probable cause to believe that King had committed or was committing a crime, or that the gun was evidence of a crime. None of these matters is material, however, if, as we have ruled above, Feddersen's initial seizure of King and the gun was constitutionally reasonable to ensure the safety of the officers and Sentwali. The State must justify warrantless Fourth Amendment activity once, but it need not do so twice.

## C.

Feddersen observed the gun's model and serial number without engaging in an unreasonable search or seizure. To look at the exterior of an object from a lawfully obtained vantage point, without moving the object, is neither a search[30] nor a seizure.[31] That is all Feddersen did,

---

[29]*See Cotten*, 75 Wn. App. at 679-80.

[30]*Cardwell v. Lewis*, 417 U.S. 583, 591-92, 94 S. Ct. 2464, 41 L. Ed. 2d 325 (1974) (plurality opinion; no search where officers, after lawfully seizing car, merely examined its exterior); *State v. Seagull*, 95 Wn.2d 898, 901-02, 632 P.2d 44 (1981) (no search, or no additional, unjustified search, if officer lawfully at vantage point merely observes "that which is there to be seen"—in other words, the exterior of objects in open or plain view); *accord State v. Young*, 123 Wn.2d 173, 182, 867 P.2d 593 (1994); *State v. Myers*, 117 Wn.2d 332, 344-47, 815 P.2d 761 (1991); *Kennedy*, 107 Wn.2d at 9-10; *State v. Myrick*, 102 Wn.2d 506, 514, 688 P.2d 151 (1984); *State v. Manly*, 85 Wn.2d 120, 124, 530 P.2d 306, *cert. denied*, 423 U.S. 855 (1975).

[31]*Arizona v. Hicks*, 480 U.S. 321, 324-25, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987); *see State v. Murray*, 84 Wn.2d 527, 527 P.2d 1303 (1974). Parenthetically, King misreads *Murray*. According to his brief, "the Washington State Supreme [C]ourt ruled that copying down a serial number of a TV . . . was an unlawful seizure." Br. of Appellant at 9. In actuality, however, the *Murray* court held that *moving the TV to view the serial number* was a search and seizure. If the serial number had been in plain view, and if the police had observed it without

once he lawfully had the gun in hand, and he needed no constitutional justification other than that discussed above.

### D.

■ Feddersen obtained information from dispatch without engaging in an unreasonable search or seizure.[32] In general, the limitations on temporarily seizing property without probable cause are the same as those on temporarily seizing persons without probable cause.[33] A seizure lawful at its inception can become unlawful if it lasts longer than reasonably necessary.[34] More specifically, a seizure can become unlawful if it lasts longer than reasonably necessary to fulfill the purpose for which it is allowed, and evidence obtained after it has become unlawful must be suppressed.[35] Although the record here is not entirely clear, it appears that dispatch responded to Feddersen's inquiries within a few minutes and, in any event, before Davidson and Quilio had completed their search for the gun used in

---

moving the TV, their conduct in observing and copying it down would not have required constitutional justification, other than that needed to show they were in a lawful vantage point in the first instance. *United States v. Gray*, 484 F.2d 352 (6th Cir. 1973), which King also relies on, is essentially the same as *Murray*.

[32]King does not cite or rely on *State v. Rife*, 133 Wn.2d 140, 943 P.2d 266 (1997), and it is easily distinguishable from this case. *Rife* involved a traffic stop rather than a criminal investigation, and statutory issues rather than constitutional ones. Moreover, it has been legislatively overruled. RCW 46.61.021, amended 1997.

[33]*United States v. Place*, 462 U.S. 696, 709, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983); *see Cotten*, 75 Wn. App. at 683 (discussing seizures of persons and property interchangeably).

[34]*Place*, 462 U.S. at 709-10 (detention of luggage for 90 minutes held unreasonable); *United States v. Sharpe*, 470 U.S. 675, 685-86, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (detention of person for 20 minutes held reasonable).

[35]*State v. Williams*, 102 Wn.2d 733, 741, 689 P.2d 1065 (1984); *State v. Cantrell*, 70 Wn. App. 340, 344, 853 P.2d 479 (1993), *aff'd in part*, 124 Wn.2d 183 (1994); *State v. Tijerina*, 61 Wn. App. 626, 628-29, 811 P.2d 241, *review denied*, 118 Wn.2d 1007 (1991); *Gonzales*, 46 Wn. App. at 394; *see Sharpe*, 470 U.S. at 685 (purpose of detention is important factor bearing on its reasonableness).

the homicide. Thus, dispatch responded before the temporary initial detention became unlawful.

## E.

██ ██ Once dispatch responded to Feddersen's inquiries, he had probable cause to arrest King and seize the gun as evidence. An indefinite seizure must be grounded on probable cause.[36] Probable cause can arise from the report of a crime victim or witness,[37] at least in the absence of circumstances tending to show the report is unreliable.[38] Once probable cause is acquired, a temporary initial detention may be converted into an indefinite detention for prosecutorial and evidential purposes.[39] When dispatch told Feddersen that King's gun had been reported stolen, Feddersen acquired probable cause to arrest King and seize the gun as evidence, and it follows that Feddersen seized both King and the gun without violating the Fourth Amendment.

## II.

We next address whether King's statements were erroneously admitted. He first argues that his statements were obtained while he was being detained in violation of the Fourth Amendment. Because we have already held to the contrary, this argument fails.

██ King next argues that Feddersen was required to give the *Miranda* warnings before asking him to identify himself. Because a *Terry* stop is not a custodial interrogation, an officer making a *Terry* stop need not give the *Miranda* warnings before asking the detainee to identify

---

[36]*Dunaway*, 442 U.S. at 209 (indefinite seizure of person); *Hicks*, 480 U.S. at 326 (indefinite seizure of object).

[37]*State v. Rodriguez*, 53 Wn. App. 571, 575, 769 P.2d 309 (1989) (quoting 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 3.4(a), at 718-20 (2d ed. 1987)).

[38]*State v. Mance*, 82 Wn. App. 539, 542-43, 918 P.2d 527 (1996).

[39]*See Cotten*, 75 Wn. App. at 685 (when homeowner expanded consent, brief initial seizure was converted to indefinite seizure).

himself.[40] The initial detention here was analogous to a *Terry* stop.[41] Thus, this argument also fails.

Lastly, King argues that his constitutional rights were violated when he was first asked whether the gun was his, and that this violation rendered inadmissible the statements he made later at the police station, even though he had received and waived the *Miranda* warnings by that time. We assume that King's constitutional rights were violated when he was first asked whether the gun was his; the trial court so ruled, and the State has not cross-appealed that ruling.

In *Oregon v. Elstad*,[42] the United States Supreme Court "consider[ed] the question whether the Self-Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant."[43] Answering no, the Court stated that

> absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.[44]

And the Court added, a few pages later:

---

[40]*Berkemer*, 468 U.S. at 441-42; *Gluck*, 83 Wn.2d at 426; *State v. Walton*, 67 Wn. App. 127, 129-30, 834 P.2d 624 (1992); *State v. Quaring*, 32 Wn. App. 728, 730, 649 P.2d 173 (1982).

[41]*See Summers*, 452 U.S. 692.

[42]470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985).

[43]*Elstad*, 470 U.S. at 303.

[44]*Elstad*, 470 U.S. at 314.

[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. We find that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.[45]

Because King does not argue that federal law and Washington law are different,[46] the factual questions pertinent here are (1) whether King's statements at the apartment were voluntary in the sense of not being coerced, and (2) whether King's statements at the police station were made after he had been properly advised of, and had knowingly, voluntarily, and intelligently waived the *Miranda* rights. The answer to both questions is yes. Thus, even if we assume that King's rights were violated when he initially admitted the gun was his, the trial court did not err by admitting the statements made at the police station.

Affirmed.

---

[45]*Elstad*, 470 U.S. at 318.

[46]*See State v. Russell*, 125 Wn.2d 24, 62, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995); *see also State v. Wethered*, 110 Wn.2d 466, 474-75, 755 P.2d 797 (1988).

Houghton, C.J., and Bridgewater, J., concur.