FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2017 JUL 17 AM 9: 17

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,           )
                               )           No. 75451-3-I
                 Respondent,   )
                               )           DIVISION ONE
        v.                     )
                               )           UNPUBLISHED OPINION
RANDY D. ANDREWS JR.,          )
B.D. 01/21/00,                 )
                               )           FILED: July 17, 2017
                 Appellant.    )

APPELWICK, J. — Andrews was convicted of robbery in the first degree after the trial court denied his motion to suppress evidence stemming from an investigatory detention. He argues that the trial court erred in concluding that there was reasonable articulable suspicion for a Terry stop,[1] that the detention did not exceed the permissible scope of a Terry stop, and that officers later had probable cause to arrest him. We affirm.

## FACTS

On October 9, 2015, Eleuterio Orazon was sitting next to a fountain in the middle of Cal Anderson Park, which is located in Seattle's Capitol Hill neighborhood. He was accompanied by his teenage nephew, Jayden Orazon, and their friend, Josh Hamlin.

---

[1] Terry v. Ohio, 392 U.S. 1, 27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

A group of young men approached them. One young man asked to see Eleuterio's[2] phone. Eleuterio declined, and the man punched him in the face. The man took Eleuterio's phone, punched him several more times, and hit Eleuterio in the head with a nearby portable speaker.

At the same time, another member of the group demanded that Jayden hand over his phone and backpack. This person may have been holding a knife. Jayden dropped his belongings and ran away. Hamlin fled as well.

Bystanders called 911, beginning at 8:29 p.m. Two officers from the Seattle Police Department responded to the 911 calls: Officers Taylor Moreland and Vaughn McKee. The officers began to assemble a description of the suspects. The officers called the initial suspect description "horrible."

After several minutes, the witnesses regained their composure and gave more detailed descriptions of the suspects. From this information, Officer Moreland compiled a description of the suspects and communicated it to his fellow officers. He described the suspects as: an " '18-20 year old Native American male wearing a white shirt, pants, with a long black ponytail' " and a " '[t]eenage black male, approximately 5'10," thin build, with 2-inch curly black hair, wearing a black sweater.' " Officer Moreland mentioned that the two young men were possibly accompanied by two other unidentified suspects. And, he included that an iPhone was stolen and a knife was used in the robbery.

---

[2] For clarity's sake, we refer to the Orazons by their first names. No disrespect is intended.

Upon hearing the suspect descriptions, Officer Anthony Ducre believed that he had seen the robbery suspects earlier that evening. Officer Ducre was in plain clothes, working as part of Seattle's Anti-Crime Team that evening. Sometime shortly before 8:25 p.m., a group of young men approached Officer Ducre in Cal Anderson Park. Based on the group's behavior, Officer Ducre believed that the young men intended to rob him. An obviously underage member of the group offered to sell Officer Ducre stolen alcohol. Officer Ducre exaggerated his movements to convince the group to back off. The group walked away to the north, toward the large fountain in the middle of the park.

After the robbery, police officers in the Capitol Hill area were watching for anyone who resembled the description of the robbery suspects. Around 12:30 a.m. on October 10, Officers Jamison Maehler and Mika Harmon noticed two young men near 10th Avenue and Pike Street. The men were Randy Andrews and Timmothy Miller. The officers noticed that both men appeared underage, which looked out of place in the nightclub district.

At 2:23 a.m., Officer Ducre saw Andrews and Miller in the same area. He recognized them as part of the group he interacted with minutes before the robbery. He alerted Officers Maehler and Harmon.

Officers Maehler and Harmon approached Andrews and Miller. The officers identified themselves and told the young men that they were being detained because they matched the description of robbery suspects. Knowing that a knife was used during the robbery, the officers patted down both suspects. A large metal object was found in Miller's pocket. It was an iPhone 6S Plus. Miller was

3

already holding a separate phone in his hand. Officer Harmon asked Miller where he got the iPhone. Miller responded that he "found it."

While Andrews and Miller were being detained, Officer Dung Do attempted to locate Eleuterio so they could complete a "show-up" identification procedure. With his lights and siren on, Officer Do drove to Harborview Medical Center. But, Eleuterio had already been released. Officer Do returned to where the suspects were being detained to obtain additional information. He was given Eleuterio's address. He drove to Eleuterio's address, arriving at about 3:00 a.m. He drove Eleuterio and Jayden to the area where Andrews and Miller were being detained. Eleuterio and Jayden completed the show-up identification procedure. They both identified Andrews as Eleuterio's attacker. Jayden identified Miller as being involved in the attack.

At that point, Officers Moreland and Maehler arrested Andrews and Miller, searched them, and read them the Miranda[3] warnings. While Andrews was being processed at the police precinct, officers observed a possible bloodstain on Andrews's white shirt. Later testing revealed that the stain consisted of Eleuterio's blood.

Andrews was charged with robbery in the first degree. He moved to suppress all evidence stemming from the investigatory detention. The trial court held a CrR 3.6 hearing. Andrews agreed to a stipulated trial, permitting the trial court to decide the case based on the police reports, information, certification for

---

[3] Miranda v. Arizona, 384 U.S. 436, 467-68, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

determination of probable cause, incident reports, witness statements, laboratory reports, and photographs.

The findings of fact and conclusions of law entered by the trial court covered both the CrR 3.6 hearing and the trial. The court concluded that the initial detention was supported by a well-founded belief that Andrews had been involved in a criminal act, and the length of the detention was justified. It concluded that officers had probable cause to arrest Andrews and Miller after the iPhone recovered from Miller's pocket was determined to be the victim's stolen phone.[4] It concluded that Andrews and Miller were functionally under arrest when they were placed in handcuffs and surrounded by officers. But, the court suppressed the show-up identification procedure, because Officer Do's language prior to the show-up was unduly suggestive.

The court concluded that Andrews was guilty of robbery in the first degree. Andrews appeals.

## DISCUSSION

Andrews asserts that the officers did not originally have a reasonable articulable suspicion to justify the stop. Therefore, he contends that the trial court erred by admitting evidence obtained after the investigatory detention. Secondly, he alleges that the detention exceeded the permissible scope of an investigatory stop. He argues that he was functionally under arrest when he was placed in

___

[4] Andrews challenges a finding of fact supporting this conclusion and the conclusion itself. The State concedes that evidence at the CrR 3.6 hearing did not establish that the iPhone was positively identified as Eleuterio's phone during the investigatory stop.

handcuffs and surrounded by police officers, yet the police did not have probable cause to arrest him.

I.    Reasonable Articulable Suspicion

Andrews contends that the trial court erred in concluding that the officers had a reasonable suspicion to seize him.  He argues that the court improperly considered the fruits of the seizure in determining whether the seizure was lawful. He asserts that the court relied on findings that are not supported by substantial evidence in reaching this conclusion.  And, he argues that the remaining facts are not sufficient to establish reasonable articulable suspicion.

We review conclusions of law from an order pertaining to the suppression of evidence de novo.  State v. Duncan, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). We review findings of fact entered following a motion to suppress for substantial evidence.  State v. Hill, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).  Evidence is substantial when it is enough to persuade a fair-minded person of the truth of the stated premise.  State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Unchallenged findings are considered verities on appeal.  State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

The Fourth Amendment to the United States Constitution protects against unlawful searches and seizures.  Article I, section 7 of the Washington Constitution protects against unwarranted government intrusions into private affairs.  Article I, section 7 provides greater protection than guaranteed by the Fourth Amendment. State v. Parker, 139 Wn.2d 486, 493-94, 987 P.2d 73 (1999).

Warrantless searches are per se unreasonable. State v. Doughty, 170 Wn.2d 57, 61, 239 P.3d 573 (2010). The State has the burden to demonstrate that a warrantless search falls within an exception to the rule. Id. The State must establish the exception to the warrant requirement by clear and convincing evidence. Garvin, 166 Wn.2d at 250.

One such exception to the warrant requirement is the Terry stop. A police officer may briefly stop and detain a person for investigation without a warrant if the officer reasonably suspects that the person is engaged or is about to engage in criminal conduct. Garvin, 166 Wn.2d at 250. Officers may briefly frisk the individual for weapons if there is a reasonable safety concern. State v. Day, 161 Wn.2d 889, 895, 168 P.3d 1265 (2007).

To justify a Terry stop, "the police officer must be able to point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. In reviewing the merits of an investigatory stop, courts evaluate the totality of the circumstances available to the investigating officer. State v. Glover, 116 Wn.2d 509, 514, 806 P.2d 760 (1991).

Andrews first argues that the trial court improperly relied on the fact that he lacked a legitimate basis to be in the area at the time. But, evidence suggesting that Andrews lacked a legitimate basis to be in the area was available prior to the Terry stop. Officer Maehler testified that at about 11:00 p.m., he saw two individuals potentially matching the robbery suspects' description on the corner of 10th and Pike. Officer Maehler stated, "And they appeared to be juveniles, so we

wanted to go contact them to see why they're out so late due to the nature of that it's only bars really open." When Officer Maehler later succeeded in contacting the two individuals, they were outside Neumos, a bar which does not admit anyone under the age of 21. Officer Harmon noted that she saw two people who appeared to be younger than 21 outside Neumos around midnight. She wondered why they were in the bar district, since they were underage. And, Officer Ducre testified that at around 2:15 a.m., he saw two young men that he believed were the people he saw in the park immediately before the robbery. He informed Officers Maehler and Harmon that he believed the young men were the robbery suspects. Andrews and Miller were not stopped by the police until after 2:23 a.m.

Thus, substantial evidence supports the finding that prior to the Terry stop, officers believed Andrews and Miller were underage and lacked a legitimate reason to be in the area.

Andrews next argues that the trial court's finding that the suspect descriptions were "detailed" is not supported by substantial evidence. He contends that because the suspect descriptions did not include information about the suspects' height, weight, facial hair, or headgear, they cannot be considered "detailed."

Initially, the officers did not have a firm description of the robbery suspects. In-car video captured Officer Moreland telling Officers Harmon and Maehler when they first arrived on scene that the descriptions were "horrible." Officer Moreland said that he was giving the witnesses some time to calm down, but that Jayden

had the best description at the time. Jayden's initial description was that it was a group of black males, and one of them was light skinned.

But, the evidence shows that once the witnesses regained their composure, they gave more detailed descriptions of the suspects. Officer Moreland synthesized these descriptions in his field report, which was completed by 10:28 p.m. on October 9. The descriptions he relayed to other officers were: an " '18-20 year old Native American male wearing a white shirt, pants, with a long black ponytail' " and a " '[t]eenage black male, approximately 5'10," thin build, with 2-inch curly black hair, wearing a black sweater.' "

This description identified key details that set the suspects apart from other people in the vicinity. Officer Maehler testified that since it was October and the weather was cooler, most people were wearing sweatshirts, so the tee shirt was a helpful identifier. And, Officer Maehler testified that the color white tends to stand out in a crowd. Because the description given to other officers included distinguishing characteristics of race, age, sex, hairstyle, and clothing, we conclude that the finding that the description was "detailed" is supported by substantial evidence.

Andrews also argues that substantial evidence does not support the finding that he closely matched the suspect descriptions. Andrews points out that witnesses described the suspect as between 18 to 20 years old, while he was just 15 years old at the time of the seizure. He notes that he was wearing a baseball cap, which was not included in the description. Thus, Andrews contends that the

only similarities between himself and the suspect description was that he was a young Native American man with a long ponytail in the company of black men.

Andrews argues that his racial characteristics are insufficient to provide reasonable articulable suspicion to detain him. He cites to United States v. Montero-Camargo, 208 F.3d 1122 (9th Cir. 2000) and United State v. Lopez, 482 F.3d 1067 (9th Cir. 2007) to support his argument. In Montero-Camargo, Border Patrol agents stopped two cars about 50 miles north of the Mexico border. 208 F.3d at 1126. The district court determined that there was reasonable suspicion for the stop, in part because the people who were stopped appeared to be Hispanic. Id. at 1131. The Ninth Circuit held that the Hispanic appearance of the defendants could not be considered as a relevant factor in the determination of particularized suspicion. Id. at 1132, 1135. But, the court noted that it did not preclude the use of racial or ethnic appearance as one factor relevant to reasonable suspicion if a specific suspect has been identified as having a particular racial or ethnic appearance. Id. at 1134 n.21.

In Lopez, officers were searching for a man who had allegedly attempted to shoot police officers. 482 F.3d at 1069-70. The suspect was described as an adult Hispanic male in his 20s with a thin build, taller, wearing a white sweater, and armed with a firearm. Id. at 1069. Officers apprehended Lopez after observing him with the driver of the getaway car. Id. at 1070. The Ninth Circuit concluded that the police lacked probable cause to believe that Lopez was the attempted shooter. Id. at 1073. While Lopez was a young Hispanic male, he lacked the

specific descriptors associated with the attempted shooter: he was only 5'6", he was not wearing a sweater, he was unarmed, and he wore glasses. Id.

Neither case prohibits the consideration of racial characteristics as one factor in considering whether the officers had a reasonable suspicion to detain Andrews. Unlike in Lopez, Andrews bore a substantial similarity to multiple descriptors: he appeared Native American, was wearing a white tee shirt, had long black hair in a ponytail, was under the age of 21, and was accompanied by a teenage black male with short black hair. Andrews's perceived race was just one characteristic that matched the description of the robbery suspects.

Evidence from the CrR 3.6 hearing supports the trial court's finding that Andrews and Miller bore a striking similarity to the robbery suspects. Officer Maehler testified that around 11:00 p.m., he saw a light-skinned, potentially Native American male with long black hair in a ponytail wearing a white shirt. He was with a shorter black male with short black hair wearing all black clothing. Officer Maehler noted that both appeared to be juveniles. Officer Maehler testified that he and Officer Harmon contacted these two individuals at about 2:30 a.m., because Officer Ducre stated that he believed they were the robbery suspects. Officer Ducre testified that when he observed Andrews and Miller standing in front of Neumos around 2:15 a.m., he positively identified them as members of the group he saw in the park shortly before the robbery occurred. He stated that based on the description of the robbery suspects, he believed the individuals he saw in the

park had committed the robbery. Substantial evidence supports the trial court's finding that Andrews and Miller bore a striking similarity to the robbery suspects.[5]

Unchallenged findings based on evidence at the CrR 3.6 hearing, included a finding that Officer Ducre interacted with a group of young men immediately before the robbery occurred. He believed they intended to rob him. He witnessed them walk off toward the large fountain in the middle of the park. Eleuterio was robbed by that fountain immediately afterward. When Officer Ducre later heard the description of the robbery suspects, he believed that the description matched the group of young men with whom he interacted earlier. Other descriptions of Andrews and Miller reveal similarities between the two individuals and the descriptions of the robbery suspects. And, Andrews and Miller were observed in the vicinity of the robbery hours afterward, even though they appeared to be too young to enter the establishments open in the area.

Based on this evidence, without consideration of any evidence gathered after detention, the trial court did not err in concluding that the officers had a reasonable articulable suspicion to conduct a Terry stop.

---

[5] That Andrews was only 15 while the robbery suspect was described as 18 to 20, and wearing a hat while the suspect was not described as wearing one, does not detract from the fact that many other characteristics matched. Andrews could have easily put on a hat in the hours that passed between the robbery and his apprehension. And, while the witnesses estimated that the suspect was between 18 and 20, officers took into consideration the fact that Andrews appeared to be under 21 in a nightclub district. His youth thus played a role in matching him to the robbery suspect.

II. Probable Cause

Andrews argues that the officers exceeded the permissible scope of a Terry stop by handcuffing him and detaining him for 40-45 minutes. But, once officers have probable cause to arrest an individual, a Terry stop may be converted into an indefinite detention for officers to gather evidence. See State v. Williams, 102 Wn.2d 733, 741, 689 P.2d 1065 (1984) (holding that police actions exceeded the scope of a Terry stop and therefore would be justified only if supported by probable cause for an arrest); State v. King, 89 Wn. App. 612, 624, 949 P.2d 856 (1998) ("Once probable cause is acquired, a temporary initial detention may be converted into an indefinite detention for prosecutorial and evidential purposes."). Thus, whether the detention exceeded the scope of a Terry stop is irrelevant if the police acquired probable cause to arrest Andrews during the detention.

Here, the trial court found that Andrews and Miller were handcuffed while they were being detained, waiting for the show-up procedure. The court found that the handcuffing occurred after the iPhone was found in Miller's pocket. The court found that once they were handcuffed, Andrews and Miller were functionally under arrest. Because Andrews and Miller were functionally under arrest prior to the show-up identification, the court concluded that the admissibility of the show-up procedure had no bearing on the validity of the arrest.

Andrews argues that the trial court correctly determined that he was functionally under arrest once he was handcuffed and surrounded by multiple officers. But, he contends that the officers did not have probable cause to arrest him at that point. The State, on the other hand, asserts that Andrews was not

under arrest until after the show-up identification procedure. Even so, it contends that the officers had probable cause to arrest Andrews when the iPhone was found in Miller's pocket.

An arrest takes place when an officer demonstrates an intent to take a person into custody and actually seizes or detains the person. State v. Patton, 167 Wn.2d 379, 387, 219 P.3d 651 (2009). To determine whether a person is in custody at a particular time, the test is whether a reasonable person in the person's position would have thought so. State v. Rivard, 131 Wn.2d 63, 75, 929 P.2d 413 (1997). This is an objective test. State v. Reichenbach, 153 Wn.2d 126, 135, 101 P.3d 80 (2004). It does not depend on the subjective intent of the officer, but instead turns on manifestations of the arresting officer's intent. State v. Salinas, 169 Wn. App. 210, 218, 279 P.3d 917 (2012). Typical manifestations of this intent include handcuffing the suspect, placing the suspect in the patrol car, and telling the suspect that he or she is under arrest. State v. Radka, 120 Wn. App. 43, 49-50, 83 P.3d 1038 (2004).

Here, officers did not originally place Andrews and Miller under arrest. When they first contacted the suspects, Officers Maehler and Harmon identified themselves as police and told Andrews and Miller that they were being detained because they matched the description of robbery suspects. Officers frisked the suspects and found that Miller had two phones, one of which was an iPhone 6S Plus. During the time between the frisk and the show-up procedure, Andrews and Miller were detained at 10th and Pike for about 40 to 45 minutes. While they were being detained, up to six additional officers arrived on the scene. The officers

surrounded Andrews and Miller. Multiple patrol cars were in the area where Andrews and Miller were being detained. And, officers handcuffed Andrews and Miller to prevent them from fleeing.

At first, the officers manifested an intent to briefly detain Andrews and Miller. But, once surrounded by approximately eight police officers and multiple patrol cars, placed in handcuffs, and detained, a reasonable person would believe themselves to be in custody. The trial court did not err in concluding that Andrews was functionally under arrest at this point.

A custodial arrest must be supported by probable cause. State v. Conner, 58 Wn. App. 90, 97, 791 P.2d 261 (1990). Probable cause exists when the arresting officer is aware of facts and circumstances, based on reasonably trustworthy information that would be sufficient for a person of reasonable caution to believe that a crime has been committed. State v. Gaddy, 152 Wn.2d 64, 70, 93 P.3d 872 (2004). Whether probable cause exists is determined by an objective standard. Id.

Here, the trial court concluded that the officers had probable cause to arrest Andrews and Miller once the iPhone recovered from Miller's pocket was determined to be the victim's stolen phone. In support of this conclusion, the trial court found that an iPhone 6S Plus was found in Miller's back pocket, and he was

already holding a different phone in his hand. Officer Harmon asked Miller where he had gotten the iPhone, and Miller replied that he had "found it."[6]

The evidence supports the existence of probable cause here. In determining whether probable cause exists, we look at all of the facts and circumstances available to the arresting officers—including those that provided a reasonable articulable suspicion for the Terry stop. See Gaddy, 152 Wn.2d at 70. Andrews and Miller fit the description of the robbery suspects that the victims provided. Officer Ducre recognized them as members of a group that was acting suspiciously in Cal Anderson Park shortly before the robbery occurred. He believed they matched the suspect descriptions. Andrews and Miller remained in the area until 2:23 a.m., even though they were underage and had no reason to be in an area with only bars open.

Additionally, the phone stolen from Eleuterio was an iPhone 6S Plus. Immediately before he was robbed, Eleuterio heard the group whisper that he was holding a new iPhone 6S Plus. He told the officers that his iPhone was stolen in the robbery. Officer Moreland communicated to other officers that an iPhone was stolen. When Andrews and Miller were stopped, Miller possessed a phone that matched the manufacturer and type of the stolen phone. He was already holding

---

[6] The court also found that, "Officers dialed the number associated with Eleuterio's stolen iPhone and the phone recovered from [Miller's] pocket rang." .

This finding (finding of fact 38) is not supported by substantial evidence from the CrR 3.6 hearing. No officers testified that the phone recovered from Miller's pocket was called at any point. The trial court asked both defense counsel and the State about this. The State conceded that no such testimony was presented. On appeal, the State again concedes that no testimony was presented at the CrR 3.6 hearing that would support this finding.

a different phone in his hand, and stated that he "found" the iPhone. The trial court found that Miller's account of how he came to possess the iPhone was not credible.

Considering all of these facts together, a reasonable person would believe that Andrews and Miller had acted together to commit a crime. Therefore, the trial court correctly concluded that the police officers had probable cause to arrest Andrews at the time he was handcuffed.

Andrews argues that the Terry stop exceeded the permissible scope, and therefore, evidence obtained as a result of the detention should have been suppressed. But, probable cause supported Andrews's arrest when he was handcuffed. At that point, the detention was no longer a Terry stop, so we need not address this issue.

We affirm.

_____
Appelwick, J.

WE CONCUR:

_____
Leach, J.

_____
Schindler, J.