

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-5-1998

# Mellott v. Heemer

Precedential or Non-Precedential:

Docket 97-7437

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Mellott v. Heemer" (1998). *1998 Decisions.* Paper 257.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/257

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 5, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-7437

WILKIE MELLOTT; BONNIE L. MELLOTT; KIRK MELLOTT;
MICHELLE HOLLINSHEAD; JACKIE WRIGHT

v.

DON HEEMER; DAVID SEICH; PAUL HARDY; MICHAEL
REGAN; UNITED STATES OF AMERICA,
Appellants

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 94-02071)

Argued: April 27, 1998

Before: ALITO, RENDELL, and GARTH, Circuit Judges

(Opinion Filed: November 5, 1998)

        DAVID M. BARASCH
        United States Attorney

        MARY C. FRYE (Argued)
        Assistant U.S. Attorney
        Office of the United States Attorney
        228 Walnut Street
        P.O. Box 11754
        Harrisburg, PA 17108

        Counsel for Appellants

        DONALD A. BAILEY (Argued)
        Suite 209
        3540 North Progress Avenue
        Harrisburg, PA 17110

        Counsel for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

This case involves allegations that several Deputy United
States Marshals used excessive force during a court-
ordered eviction. On appeal, the marshals contend that the
district court erred by refusing to grant summary judgment
in their favor on grounds of qualified immunity. Because we
conclude that the marshals are entitled to summary
judgment on all the plaintiffs' claims, we reverse.

I

Bonnie and Wilkie Mellott ("the Mellotts") are former
owners of land in Pennsylvania on which they resided and
operated a dairy farm. The Mellotts' son, Kirk, also resided
on the property in a separate house located about a mile
away from his parents' home. In the early 1980s, the
Mellotts borrowed money to purchase additional land and
to make improvements on their farm. After falling far
behind in their debt payments, the Mellotts filed a
voluntary petition for bankruptcy in 1989. The Mellotts'
property was sold at a public auction in November 1992,
and the bankruptcy court issued an order directing the
Mellotts to vacate the premises by December 10, 1992.

The Mellotts failed to leave their former property by that
date, and the bankruptcy court issued an order of
contempt on December 21, 1992. The court directed the
Mellotts, under penalty of incarceration and/or fine, to
vacate the premises by December 28, 1992. The Mellotts
still refused to leave and instead responded byfiling a
motion to vacate the judgment, a notice of appeal, a motion
to disqualify the bankruptcy judge, and a notice of motion

2

to stay. On December 31, 1992, the bankruptcy court denied the Mellotts' motions and signed a writ of assistance directing the United States Marshal Service to serve the Mellotts with a notice stating that all persons and personal property had to be removed from the premises by January 5, 1993. The deputy marshals testified that they posted the notices at the Mellotts' residence on December 31, 1992, and Kirk Mellott testified that he found a notice on his door that same day. Kirk further testified that he discussed the notice with his parents and understood that the notice ordered him to vacate the premises.

After the Mellotts again failed to leave by the ordered date, the bankruptcy court issued a writ of assistance, dated January 11, 1993, directing the United States Marshal Service to secure the auctioned land and remove all persons from the premises. Upon receipt of the writ, Supervisory Deputy United States Marshal Robert Byerts assigned Deputy Marshal Don Heemer to head a team of five deputy marshals ("the marshals") that would remove the Mellotts from the property. Byerts testified that he provided the marshals with the following information prior to the eviction:

> a. The Bankruptcy Court had requested additional security for hearings at which the Mellotts were expected to appear;
> b. A Farmers Home Administration [FHA] County Supervisor had reported that Wilkie Mellott had chased him off the Mellott property at the front of a pick-up truck; that Wilkie Mellott had displayed a handgun after chasing the County Supervisor off the property in a pick-up truck; that Wilkie Mellott had threatened to shoot any federal agent that came on his property; and that the County Supervisor had felt his life had been threatened by Wilkie Mellott.
> c. The Mellotts were reported to own numerous firearms.
> d. Kirk Mellott had recently sustained a serious head injury and was considered unstable.
> e. Kirk Mellott had informed Deputy Marshals Regan and Knicely that the Mellotts were not going to leave the farms.

3

App. 59–60. See also App. 100–110, 114, 117, 162–63 (deposition of Donald Heemer); App. 182–85 (deposition of David Seich).1 Byerts further testified that the marshals wore bullet-proof vests and "were authorized to use a short shotgun and an AR-15 semi-automatic rifle in the removal operation because of concerns that they might meet armed resistance at the Mellott residences." App. 59.

On the morning of January 21, 1993, the marshals met with at least two uniformed state troopers and drove to the Mellotts' residence. Viewing the evidence in the light most favorable to the plaintiffs, the eviction proceeded as follows.2

When the officers arrived at the Mellotts' residence, they approached the house, and Deputy Marshal Heemer knocked on the front door. After Bonnie Mellott answered the door, Heemer entered the house, pointed his gun "right in her face," pushed her into a chair, and kept his gun aimed at her for the remainder of the eviction. App. 264–65, 424, 441. Deputy Marshall David Seich entered the house next, "pumped a round into the barrel" of his sawed-off shotgun, pointed it at Wilkie Mellott, and told him "to sit still, not move and to keep his mouth shut." App. at 265. See also App. at 440–41. With respect to this encounter,

---

1. Like the district court, we consider the existence of the Byerts' briefing to be undisputed. See Dist. Ct. Op. at 8. Although the plaintiffs disagree, see Appellees' Br. at 25–29, they have presented no evidence to contradict the marshals' testimony that the briefing took place. Rather, the plaintiffs have merely demonstrated that there is a dispute as to whether all of the information Byerts provided to the marshals was accurate. For example, the Mellotts presented evidence that contradicted the FHA agent's account of his confrontation with Wilkie Mellott. It is not relevant, however, that the Mellotts have disputed the agent's version of events. Rather, the critical question is whether the agent's account was provided to the marshals by their supervisor. The marshals testified that it was, and the plaintiffs point to no evidence indicating otherwise.

2. We note that the marshals dispute nearly every material factual allegation made by the plaintiffs, including the most serious claims that the deputy marshals pointed loaded guns at various individuals during the eviction. For purposes of summary judgment, however, we must view the evidence in the light most favorable to the non-moving party. See Peters v. Delaware River Port Authority, 16 F.3d 1346, 1349 (3d Cir. 1994).

there is evidence that the marshals were aware before the eviction that Wilkie Mellott was recovering from heart surgery. Supp. App. at 9 n.3 & 42. Behind Seich, two more marshals entered the house along with a state trooper who identified himself and said that he "was there for everybody's protection." App. at 266.

Also present in the Mellotts' home at the time of the eviction were Michelle Hollinshead, a radio reporter, and Jackie Wright, a friend of the Mellotts. When the marshals entered the residence, Wright was in the front room with the Mellotts, and Hollinshead was in the kitchen on the telephone with the local sheriff. Hollinshead testified that one of the marshals ran into the kitchen, "pumped" his semi-automatic gun, "stuck it right in [her] face and . . . said: `Who are you talking to, hang up the phone.' " App. at 454-55. See also App. at 461-63. After Hollinshead continued talking, the marshal put his gun "to the back of her head" and told her to "[s]hut the hell up and hang up the phone." App. at 455. At this point, Hollinshead hung up the phone, and the marshal put his gun into her back and shoved her down a hallway towards the front room.

In the meantime, while two marshals were conducting a sweep of the residence,[3] Wilkie Mellott said he felt ill and requested his medication. When Bonnie Mellott rose to get the medication, Deputy Heemer pushed her back into her chair and asked her where the medication was located. After receiving this information, Heemer retrieved Wilkie Mellott's medication and handed it to him.

At some point during the eviction, Bonnie Mellott overheard the marshals discussing their plans to remove Kirk Mellott from his residence, and she offered to accompany them to Kirk's house. The marshals rejected this offer but agreed to allow Jackie Wright to come with them. In their depositions, both Wright and Bonnie Mellott

---

3. Our account of the facts does not include the plaintiffs' allegations that the marshals violated the Constitution by "ransacking" the Mellotts' former residences. See Appellees' Br. at 32-34. The district court found that the plaintiffs' "ransacking" claim did "not rise to the level of a constitutional violation," Dist. Ct. Op. at 27 n.10; id. at 24, and the plaintiffs have not appealed this holding.

explained that they were concerned about how Kirk might react to the marshals, see App. at 272 & 426, and Bonnie testified that she believed it would be helpful if Kirk saw a "familiar face." App. at 310. Before proceeding to Kirk's house, the deputy marshals directed Bonnie and Wilkie Mellott to leave the property, and Deputy Heemer allegedly told them to start driving and not to look back or they would be shot. Bonnie Mellott also testified that Heemer said they would be shot as trespassers if they went to Kirk's house.

After the Mellotts departed, Jackie Wright drove to Kirk's residence in his own vehicle, followed by the marshals and the state troopers. Wright testified that, once at the house, the marshals told him that he "was going to go through the door first ahead of them." App. at 429. One marshal advised Wright "that if anything goes wrong . . . you're going to be the first one to go down," and as they were "heading into the house," Wright felt a "gun in [his] back." Id. See also App. at 379. Wright entered the house without knocking and found Kirk Mellott sitting in his living room with a bag full of his belongings. Defendant Heemer then approached Kirk, "aimed his gun at [his] chest, physically took [him] by the arm, spun him around and pushed him up against the wall." App. at 386–87. After searching Kirk's bag and conducting a sweep of the residence, the marshals escorted the two men out of the house and ordered them off the property.

The plaintiffs filed an amended complaint in January 1995, alleging, inter alia, that the individual defendants violated their Fourth Amendment right to be free from unreasonable seizures and their Fifth Amendment right to substantive due process. The defendants moved for summary judgment on the ground that they were entitled to qualified immunity, and the district court denied their motion, finding that there were material issues of fact as to (1) whether the defendants violated the plaintiffs' Fourth and Fifth Amendment rights by using excessive force during the eviction and (2) whether the defendants reasonably could have believed that their conduct did not violate clearly established law. We have jurisdiction over the defendants' appeal under the collateral order doctrine. See

Acierno v. Cloutier, 40 F.3d 597, 605 (3d Cir. 1994) (in banc).

II

A. The marshals are entitled to qualified immunity if, at the time they acted, they reasonably could have believed that their conduct did not violate the plaintiffs' clearly established constitutional rights. See Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir. 1997). In addressing the qualified immunity question, we first ask whether the plaintiffs have "asserted a violation of a constitutional right at all." Siegert v. Gilley, 500 U.S. 226, 232 (1991). Because we conclude that they have not, we must reverse the district court's denial of summary judgment.

The Supreme Court has instructed that "all claims that law enforcement officers have used excessive force. . . in the course of a[ ] . . . `seizure' of a free citizen should be analyzed under the Fourth Amendment and its `reasonableness' standard, rather than under a `substantive due process' approach." Graham v. Connor, 490 U.S. 386, 395 (1989). Since all of the plaintiffs' excessive force claims in the instant case involve allegations that the marshals restrained the plaintiffs' liberty through physical force and the pointing of guns, we must analyze the plaintiffs' claims under the Fourth Amendment. See id. at 395 n.10.

In order to prevail on a Fourth Amendment excessive force claim, a plaintiff must demonstrate that the defendant's use of force was not "objectively reasonable." Graham v. Connor, 490 U.S. 386, 397 (1989). Proper application of this standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. In addition, we have noted that it is important to consider how many individuals the officers confronted and whether "the physical force applied was of such an extent as to lead to injury." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997). When balancing these factors, we must remember

7

that "[t]he `reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather then with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 396-97. We must also keep in mind that a threat that may seem insignificant to us in the security of our chambers may appear more substantial to a reasonable officer whose own life or safety is at stake.

B. Turning to the case before us, the plaintiffs' claims all center on allegations that the deputy marshals pointed loaded guns at their heads, chests, and backs. In addition, Bonnie Mellott claims that she was pushed into a chair on two occasions, and Jackie Wright claims that he was led at gunpoint into a potentially dangerous situation.

We have recently considered allegations of excessive force similar to those made here. In Sharrar, more than 20 law enforcement officers surrounded a house containing four suspects wanted in connection with a particularly violent domestic assault. 128 F.3d at 814-816. After the suspects complied with the officers' instruction to exit the house backwards, they were ordered to lie face-down in the dirt. Id. at 816. The plaintiffs claimed that, at this point, the officers held guns to their heads, yelled obscenities, and threatened to "blow [their] brains out" if they moved. Id. at 816 & 821. While we acknowledged that the officers' alleged conduct "appear[ed] extreme," id. at 821, we concluded that it did not violate the Fourth Amendment. Id. at 822.

The marshals contend that their actions cannot be found unlawful since the Mellotts' "allegations of force . . . are minimal compared to the allegations of force found to be constitutionally permissible in Sharrar." Appellants' Br. at 23. While we do not necessarily agree that the allegations in this case are "minimal" compared to those in Sharrar, we do believe that the explicit threats alleged in Sharrar were at least as forceful as the implicit threats alleged here. However, contrary to the marshals' suggestion, it is not enough simply to compare the force used in this case with

the force employed by the officers in Sharrar. Several of the "reasonableness" factors discussed in Graham and Sharrar weigh differently here than they did in Sharrar, with some favoring the Mellotts and others favoring the deputy marshals. Therefore, while comparison to Sharrar can be instructive, our reasonableness determination must ultimately turn on the unique facts and circumstances confronting the marshals in this case.

Looking first to the "severity of the crime" factor from Graham, we note that the marshals were not arresting the Mellotts for a violent crime, but rather were removing them from their former property after they repeatedly failed to obey a court order. We also note, however, that an eviction from a cherished family residence can be an emotionally charged event. Turning to the "active resistance" factor discussed in Graham, we conclude that this factor does not weigh in favor of the deputy marshals since there is virtually no evidence of resistance during the eviction itself.[4] However, the final Graham factor --"threat to the safety of officers or others" -- weighs heavily in the marshals' favor and leads us to conclude that their alleged conduct during the eviction was objectively reasonable at the time.

Prior to the eviction, Supervisor Byerts informed the deputy marshals that Wilkie Mellott had threatened to shoot any federal agent who came on his property, was reported to own numerous firearms, and had chased an FHA agent off his property with a pick-up truck. Moreover, Byerts told the marshals that Kirk Mellott was considered unstable and had stated that the Mellotts would not leave the property. In light of these warnings, the marshals had significant reason to fear armed confrontation. Under these circumstances, it was objectively reasonable for the marshals to load and point their weapons in an effort to discourage resistance and ensure their own safety.

While the luxury of hindsight might enable us to think of alternatives to the marshals' actions, we must heed the

_____

4. Because Michelle Hollinshead's testimony indicates that she did not hang up the phone immediately after being told to do so by one of the marshals, this factor does weigh in favor of the defendants with respect to actions taken after Hollinshead disobeyed the marshal's instruction.

Supreme Court's admonition to account for the "tense, uncertain, and rapidly evolving" circumstances facing officers at the time of their actions. Here, when the deputy marshals entered the front room of the Mellotts' house, they discovered not only Bonnie and Wilkie Mellott, but a third unidentified individual, Jackie Wright, and they heard a fourth unidentified individual, Michelle Hollinshead, talking in another room. At the time, the marshals had no way of knowing to whom Hollinshead was speaking on the phone, and the marshals reasonably could have feared that she was calling a confederate of the Mellotts. In this respect, it is noteworthy that Kirk Mellott, whom the deputy marshals believed to be unstable, had not yet been found. On a related note, we find that one of the additional reasonableness factors discussed in Sharrar -- "the number of persons with whom the police officers must contend at one time," 128 F.3d at 822 -- weighs significantly in the marshals' favor. Unlike in Sharrar, where there were over 20 officers on hand to confront four individuals who peaceably surrendered en masse, here there were fewer than 10 officers present to contend with five individuals who were not all found in the same place at the same time.

Our conclusion that the marshals acted reasonably is further bolstered by another factor discussed in Sharrar: whether the force applied by the officers led to physical injury. Although Wilkie Mellott did experience chest pains during the eviction, the marshals promptly retrieved his medicine, and there is no allegation that Wilkie Mellott suffered any further complications. In addition, while the plaintiffs claim that Bonnie Mellott was pushed into a chair on two occasions, they present no evidence of resulting physical injury. In this respect, we must be mindful of the Supreme Court's instruction that "[n]ot every push or shove . . . violates the Fourth Amendment." Graham, 490 U.S. at 396.

In sum, in light of the reports of the Mellotts' threatening behavior, the uncertainty of the situation confronting the marshals during the eviction, and the lack of any physical injury to the plaintiffs, we find that the force used by the marshals in confronting Bonnie Mellott, Wilkie Mellott, Michelle Hollinshead, and Kirk Mellott was objectively reasonable at the time.

10

C. Several arguments made by the dissent require a brief response. First, contrary to the dissent's argument, this case is easily distinguishable from Baker v. Monroe Township, 50 F.3d 1186 (3d Cir. 1995). In Baker, the court held, among other things, that the facts could support a finding that certain law enforcement officers violated the Fourth Amendment when they pointed firearms at and handcuffed Inez Baker, two of her children, and a foster daughter. These individuals had been invited to Sunday dinner at the apartment of Inez Baker's son, but they had the misfortune to arrive just as the officers were conducting a drug raid on the apartment. Viewing the facts in the light most favorable to the plaintiffs, the court concluded that "the appearances were those of a family paying a social visit" and that there was "simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used." Id. at 1193. Here, for the reasons already discussed, the marshals had reason to fear for their safety when they entered the Mellott residence.

The dissent points out that "defendant Heemer himself testified in his deposition that pointing a gun at an unarmed person was `absolutely' inappropriate conduct." Dissent at 15, lines 39-40 to 16, line 1. But our task here is to apply constitutional standards, not standards of "appropriateness." Elder v. Holloway, 510 U.S. 510, 515 (1995); Davis v. Scherer, 468 U.S. 183, 193-96 & n.14 (1984).

The dissent observes that "whatever fear the marshals had to cause them to descend on the Mellott farm with guns blazing was immediately dissipated when they encountered a pastoral scene of several people sitting peaceably in a parlor." Dissent at 16, lines 24-27. Putting aside (a) the fact that the marshals' guns were never fired and thus were not "blazing" in the usual sense of that term and (b) the fact that violence can erupt in a "pastoral" (i.e., country) setting, a reasonable officer was not, in our view, required to banish all fear upon seeing that Bonnie and Wilkie Mellott and Jackie Wright were sitting in the parlor with no firearms in view. A reasonable officer could have feared that firearms might be hidden and that the individuals in the parlor might have tried to obtain access

11

to them. A reasonable officer also could have feared that other persons might be in other rooms in the house. As we noted, the officers encountered one unidentified person, Jackie Wright, in the parlor, heard another, Michelle Hollinshead, talking in another room, and had no knowledge of the whereabouts of Kirk Mellott.

The dissent states that "[w]hile it might have been reasonable for the marshals to approach and enter the home in an aggressive mode," the officers should have "adjust[ed] their response" when "Wilkie Mellott assured [them] that no one else was in the house and since they knew the marshals were coming, he had removed the guns." Dissent at 16, lines 27–34. However, a law enforcement officer with his or her own safety at stake could have reasonably proceeded with greater skepticism.

D. Jackie Wright's claim, while also subject to the considerations discussed above, is somewhat unique and requires additional analysis. The relevant facts, as stated by Wright in his deposition, are as follows:

> I pulled in front of [Kirk Mellott's] house and . . . walked back toward the marshals' car. [One of the marshals] told me to come over there and I walked over there. And he told me I was going to go through the door first ahead of them. And he said, I want to advise you that if anything goes wrong in here you're going to be the first one to go down[,] and as we were heading into the house, I felt a gun in my back.

App. at 429. Based on this account, the plaintiffs contend that the marshals violated the Constitution by using Wright as an unwilling "human shield" in a potentially dangerous situation.

We hold that the defendants are entitled to summary judgment on this claim because the evidence in the summary judgment record cannot support a finding that Jackie Wright was seized or that a reasonable officer could not have believed that Wright was not seized. " `[A] person has been `seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " California v. Hodari

12

D., 499 U.S. 621, 627-28 (1991), quoting United States v. Mendenhall, 446 U.S. 544, 554 (1986) (opinion of Stewart, J.). See also Michigan v. Chesternut, 486 U.S. 567, 573 (1988); INS v. Delgado, 466 U.S. 210, 215 (1984). Here, it is undisputed that the marshals did not restrain Wright's liberty when he accompanied them to Kirk Mellott's residence. The marshals did not compel Wright to go with them; on the contrary, they originally refused when Bonnie Mellott asked to accompany them but eventually acceded to Wright's request. Thus, in order to survive summary judgment on his Fourth Amendment claim, Wright would have to point to evidence in the summary judgment record, that at some point after he arrived at Kirk's house, he changed his mind and decided that he did not want to enter the house with the marshals but that the marshals forced him to do so. No such evidence, however, has been called to our attention. There is no evidence that the marshals told Wright that he was not free to leave. Moreover, Wright did not state during his deposition that he ever told the marshals that he wished to leave or to remain outside Kirk's house. Nor did he testify that the marshals ever told him that he was not free to leave or to stay outside the house.

In light of this background, the summary judgment record is insufficient to convince a reasonable fact finder that a reasonable person in Wright's position would have felt that he was not free to leave the scene or to stay outside the house. Wright points to his deposition testimony that one of the marshals told him that he was "going to go through the door ahead of them" and that if anything went wrong he was "going to be the first to go down." App. 429. However, in light of the fact that Wright had sought permission to accompany the marshals when they went to find Kirk Mellott, this statement alone was insufficient to convey to a reasonable person in Wright's position the message that he was not free to leave. Instead, the statement seems to convey the message that a condition of the permission given to Wright to enter the house was that he take the most dangerous lead position when the entry was made.

Wright notes that he "felt a gun in [his] back" as he walked into the house. App. 429. But, in light of the

13

background previously noted, this evidence is also insufficient to convey to a reasonable person in Wright's position the message that he was not free to go. With Wright in the lead and with the marshals following close behind with their guns drawn, it would not be surprising for Wright to feel a gun touch his back even though he was entering the house voluntarily. Taking the evidence in the summary judgment record as a whole, we hold that there is not enough to show that Wright was seized.

Moreover, even if a reasonable fact finder could conclude that Wright was in fact seized, the defendants would still be entitled to summary judgment based on qualified immunity. A reasonable officer in the position of the marshals could easily have thought that a reasonable person in Wright's position -- having asked to accompany them, having never expressed a desire to depart or to stay outside the house, and having never been told that he was not free to do so -- would not feel that his liberty was restrained.5

III

For the reasons explained above, we reverse the district court's denial of the defendants' summary judgment motion, and we remand for the entry of judgment in their favor.

_____

5. In arguing that Wright's "human shield" claim should be analyzed under Fourth Amendment, rather that substantive due process, standards, the defendants' reply brief states that "it is difficult to imagine a more clear allegation of "seizure" of one's person than claiming that a law enforcement officer held one at gun point as a human shield." Reply Br. at 13. We do not interpret this as a concession that Wright was in fact seized. Rather, we interpret this statement to mean only that compelling a person to function as a human shield would constitute a seizure.

14

RENDELL, Circuit Judge, dissenting:

The majority's conclusion that the conduct in this case was, without doubt, objectively reasonable and not excessive based upon plaintiff's chilling tale runs counter to our Fourth Amendment jurisprudence as most recently explicated in Baker v. Monroe Township, 50 F.3d 1186 (3d Cir. 1995) -- relied upon by the district court but not mentioned in the majority's opinion -- and Sharrar v. Felsing, 128 F.3d 810 (3d Cir. 1997). I must part company with my colleagues because I agree with the district court's well-reasoned determination that the issue of reasonableness of the marshals' conduct under the circumstances of this case is properly a question for the jury.

In Baker, we addressed conduct similar to the marshals' actions here, namely, the pointing of guns, as well as the use of handcuffs, stating that the use of this type of force must be justified by the circumstances. We noted that "we must look at the intrusiveness of all aspects of the incident in the aggregate." 50 F.3d at 1193. Baker involved a police stop and detention of three individuals entering a residence while the police were conducting a drug raid. The police stopped them, pushed them down to the ground with guns drawn, and handcuffed and detained them for 15-25 minutes. We reversed the district court's grant of qualified immunity because there was sufficient evidence from which a jury could find a Fourth Amendment violation. The police in Baker admitted that the use of handcuffs would have been "inappropriate" until there was an arrest. We assessed the police conduct in the following terms:

> Here, accepting the Bakers' testimony, the police used all of those intrusive methods without any reason to feel threatened by the Bakers, or to fear the Bakers would escape . . . the appearances were those of a family paying a social visit . . . there is simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used.

Id. Similarly, in this case, defendant Heemer himself testified in his deposition that pointing a gun at an

15

unarmed person was "absolutely" inappropriate conduct. Further, the marshals encountered a peaceful scene with no indication of resistance or force on the part of the Mellotts, and there is no evidence of anything that should have caused them to use the force indicated here.

The majority distinguishes the instant situation on the basis of the threat to the safety of the officers. However, in reality, a jury might well determine that the likelihood of violence toward the marshals was not so great, given the context of the incident discussed below, and the fact that the only person who had witnessed aggressive behavior on the part of the Mellotts was an agent of the Farmers Home Administration who had been chased off the farm property by Mellott in a pickup truck.

The court's opinion fails to note a few facts which could color a jury's view of the overall atmosphere and context of the incident in question. First, the Mellotts had made themselves notorious for their litigious ways, and they, along with other farmers being counseled by the same advisor, were suing the Farmers Home Administration. This fact was not lost on the marshals effecting the evictions. Nor, I would imagine, were they unaware that the Mellotts were testing the patience of various federal agencies.[1] Furthermore, whatever fear the marshals had to cause them to descend on the Mellott farm with guns blazing was immediately dissipated when they encountered a pastoral scene of several people sitting peaceably in a parlor. While it might have been reasonable for the marshals to approach and enter the home in an aggressive mode, the clearly passive conduct of those present should have caused them to adjust their response to the situation accordingly. Officer Heemer testified specifically that Wilkie Mellott assured him that no one else was in the house and since they knew the marshals were coming, he had removed the guns. The force used thereafter was not clearly, objectively reasonable, and, given our precedent in Baker as a guide, the jury should be the judge of this conduct. I also disagree with the majority's view that Jackie Wright's Fourth Amendment rights were

_____

1. Mrs. Mellott testified that the bankruptcy judge said he would "make an example" of them.

16

not violated as a matter of law as he accompanied the marshals to Kirk Mellott's house, notwithstanding having a gun in his back and being told he would be first to go down if anything went wrong. I find this situation as presenting at least an arguable seizure, depending upon whose version of the facts the jury believes.

Although the majority analogizes this situation to Sharrar, I submit that the facts in that case are quite different. Sharrar involved the propriety of the arrests of individuals wanted for assault, holed up in a home in an otherwise peaceful seashore community, and the extent of force employed by teams of law enforcement personnel in surrounding the residence and effecting the arrest of these individuals. The majority in Sharrar stated that the Rambo-type behavior under the circumstances came "close to the line," although not constituting a Fourth Amendment violation. 128 F.3d at 822.

Here, where seven marshals detained and terrorized a family and friends, and ransacked a home, while carrying out an unresisted civil eviction, their conduct, which could be described as Gestapo-like, is even closer to the line, if not over the line. We should not cloak it in the protective veil of immunity at the summary judgment stage. Just as in Baker, where we reversed summary judgment granting qualified immunity so that a jury could judge the objective reasonableness of the police conduct, here we should affirm the excellent reasoning of the district court, following our precedent in Baker, that genuine issues exist as to the reasonableness of the marshals' behavior. The matter should proceed to trial on the issue of the alleged violations of the Fourth Amendment rights of all of the plaintiffs and the marshals' entitlement to qualified immunity. I would affirm.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit